1   DAVID T. DIBIASE (Bar No. 56883)
      dtd@amclaw.com
2   DAVID J. BILLINGS (Bar No. 175383)
      djb@amclaw.com
3   ANDERSON, McPHARLIN & CONNERS LLP
    Thirty-First Floor
4   444 South Flower Street
    Los Angeles, California  90071-2901
5   TELEPHONE: (213) 688-0080 ♦ FACSIMILE: (213) 622-7594

6   Attorneys for Defendant
    TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA

7

8                 UNITED STATES DISTRICT COURT

9        CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

10

11  CHILDREN'S HOSPITAL OF ORANGE          Case No. **SACV08-1307 JVS (RNBx)**
    COUNTY, a California nonprofit
12  public benefit corporation; and        NOTICE OF REMOVAL
    CHILDREN'S HOSPITAL AT MISSION,
13  a California non-profit public
    benefit corporation,
14
           Plaintiffs,
15
        vs.
16
    TRAVELERS CASUALTY AND SURETY
17  COMPANY OF AMERICA, a
    Connecticut corporation; UNITED
18  HEALTH CARE, INC., dba UNITED
    HEALTH GROUP aka UNITED HEALTH
19  CARE INSURANCE COMPANY, a
    Delaware corporation and DOES 1
20  through 100, inclusive,

21         Defendants.

22

23  TO THE HONORABLE JUDGES OF THE UNITED STATES DISTRICT COURT FOR

24  THE NORTHERN DISTRICT OF CALIFORNIA AND THE PLAINTIFFS HEREIN:

25      PLEASE TAKE NOTICE that defendant, TRAVELERS CASUALTY AND

26  SURETY COMPANY OF AMERICA ("TRAVELERS" and "the Removing

27  Defendant"), on its behalf, by its undersigned attorneys, hereby

28  / / /

FILED - SOUTHERN DIVISION
CLERK, U.S. DISTRICT COURT

NOV 1 8 2008

CENTRAL DISTRICT OF CALIFORNIA
BY                          DEPUTY

ANDERSON, McPHARLIN & CONNERS LLP
LAWYERS
444 SOUTH FLOWER STREET, THIRTY-FIRST FLOOR
LOS ANGELES, CALIFORNIA 90071-2901
TEL (213) 688-0080 • FAX (213) 622-7594

707285.1 2985.518

1   removes to this Court the State Court action based on diversity

2   jurisdiction as follows:

3       1.   On October 20, 2008, an action was commenced in the

4   Superior Court of the State of California, County of Orange, Case

5   No. 00113460, entitled *Children's Hospital of Orange County, et*

6   *al. v. Travelers Casualty & Surety Company of America, et al.,*

7   ("the State Court Action").   Attached hereto as **Exhibit "1"** is a

8   true and correct copy of the Summons and Complaint filed in the

9   State Court Action.

10      2.   On October 23, 2008, TRAVELERS was first served with a

11  copy of the Summons and Complaint in the State Court Action.

12  TRAVELERS is informed and believes that defendant UNITED HEALTH

13  CARE, INC., dba UNITED HEALTH GROUP aka UNITED HEALTH CARE

14  INSURANCE COMPANY ("UHC"), has not been served as of the date of

15  this Notice of Removal.   Thus, UHC's consent to the removal is

16  not necessary because it has not been served.   *Salveson v.*

17  *Western States Bankcard Ass'n*, 731 F.2d 1423, 1429 (9th. Cir.

18  1984).

19      3.   No proceedings have been held in the State Court

20  Action.   Exhibit "1" attached hereto (the Summons and Complaint)

21  consists of all the pleadings filed in the State Court Action.

22      4.   The above-described action is a civil action of which

23  this Court has original jurisdiction under the provision of

24  28 U.S.C. Sections 1332 and 1441 according to the following

25  facts:

26          (a)   Plaintiff, CHILDREN'S HOSPITAL OF ORANGE COUNTY is

27  a California nonprofit public benefit corporation incorporated

28  under the laws of the State of California, with its principal

ANDERSON, McPHARLIN & CONNERS LLP
LAWYERS
444 SOUTH FLOWER STREET, THIRTY-FIRST FLOOR
LOS ANGELES, CALIFORNIA 90071-2901
TEL (213) 688-0080 • FAX (213) 622-7594

707285.1 2985.518

1 place of business in the City and County of Orange, State of

2 California.  Thus, CHILDREN'S HOSPITAL OF ORANGE COUNTY is a

3 citizen of the State of California.

4       (b)  Plaintiff, CHILDREN'S HOSPITAL AT MISSION is a

5 California nonprofit public benefit corporation incorporated

6 under the laws of the State of California, with its principal

7 place of business in the City of Mission Viejo, County of Orange,

8 State of California.  Thus, CHILDREN'S HOSPITAL AT MISSION is a

9 citizen of the State of California.

10       (c)  Defendant TRAVELERS CASUALTY AND SURETY COMPANY OF

11 AMERICA, was at the time of this action and still is a

12 corporation incorporated under the laws of the State of

13 Connecticut, with its principal place of business in Hartford,

14 Connecticut.  Thus, THE TRAVELERS INDEMNITY COMPANY is a citizen

15 of the State of Connecticut.

16       (d)  Defendant UNITED HEALTH CARE, INC., dba UNITED

17 HEALTH GROUP aka UNITED HEALTH CARE INSURANCE COMPANY was at the

18 time of this action and still is a corporation incorporated under

19 the laws of the State of Delaware, with its principal place of

20 business in Minneapolis, Minnesota.  Thus, UNITED HEALTH CARE,

21 INC., dba UNITED HEALTH GROUP aka UNITED HEALTH CARE INSURANCE

22 COMPANY is a citizen of the States of Delaware and Minnesota.

23       (e)  None of the defendants is a citizen of California

24 and the parties are completely diverse.  28 U.S.C. §1332(a).

25    5.   It is facially apparent from the Complaint that the

26 amount in controversy exceeds the sum of Seventy-Five Thousand

27 Dollars ($75,000), for the following reason:

28 / / /

ANDERSON, McPHARLIN & CONNERS LLP
LAWYERS
444 SOUTH FLOWER STREET, THIRTY-FIRST FLOOR
LOS ANGELES, CALIFORNIA 90071-2901
TEL (213) 688-0080 • FAX (213) 622-7594

1      (a)   The Complaint seeks damages for Breach of Contract

2  in the amount of $1,000,465.73, plus interest.   See the Complaint

3  attached hereto as Exhibit "1" at pg. 9, ¶ 49.

4      6.   The fictitious defendants and erroneously named

5  defendants that are not legal entities named in the complaint are

6  disregarded for purposes of assessing diversity of citizenship;

7  and

8      7.   This action is therefore properly removable pursuant to

9  28 U.S.C. §1441(a).

10     8.   The only other defendant in this action, UNITED HEALTH

11 CARE, INC., dba UNITED HEALTH GROUP aka UNITED HEALTH CARE

12 INSURANCE COMPANY has not been served as of the date of this

13 Notice of Removal.   Thus, UHC's consent to the removal is not

14 necessary because it has not been served.

15     9.   TRAVELERS will promptly file a copy of this removal

16 with the Clerk of Superior Court for the State of California,

17 County of Orange.

18     **WHEREFORE**, defendant TRAVELERS respectfully requests that

19 this Court assume jurisdiction over this case and that the case

20 proceed before this Court as an action properly removed.

21

22 DATED: November *17*, 2008     ANDERSON, McPHARLIN & CONNERS LLP

23

24                          By: _David T. dbvrl_____

25                               David T. DiBiase
                                 David J. Billings
26                               Attorneys for Defendant TRAVELERS
                                 CASUALTY AND SURETY COMPANY OF
27                               AMERICA

28

ANDERSON, McPHARLIN & CONNERS LLP
LAWYERS
444 SOUTH FLOWER STREET, THIRTY-FIRST FLOOR
LOS ANGELES, CALIFORNIA 90071-2901
TEL (213) 688-0080 • FAX (213) 622-7594

Exhibit "1"

10/20/2008  15:22    17145418182                FIRST LEGAL                    PAGE  03/04

## SUMMONS
### (CITACION JUDICIAL)

SUM-100

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA, a
Connecticut corporation; UNITED HEALTH CARE, INC.,
dba UNITED HEALTH GROUP aka UNITED HEALTH CARE
INSURANCE COMPANY a Delaware corporation and DOES 1
through 100, inclusive.

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
CHILDREN'S HOSPITAL OF ORANGE COUNTY a California
nonprofit public benefit corporation; and CHILDREN'S
HOSPITAL AT MISSION, a California nonprofit public
benefit Corporation.

FOR COURT USE ONLY
*(SOLO PARA USO DE LA CORTE)*

**FILED**
SUPERIOR COURT OF CALIFORNIA
COUNTY OF ORANGE
CENTRAL JUSTICE CENTER

**OCT 20 2008**

ALAN CARLSON, Clerk of the Court

BY ____M. WILSON____ ,DEPUTY

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association.

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.courtinfo.ca.gov/selfhelp/espanol/), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.courtinfo.ca.gov/selfhelp/espanol/) o poniéndose en contacto con la corte o el colegio de abogados locales.*

| | |
|---|---|
| The name and address of the court is: *(El nombre y dirección de la corte es):* Orange County Superior Court 700 Civic Center Drive West \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\* Santa Ana, CA  92701 Central Justice Center | CASE NUMBER: *(Número del Caso):* **30-2008 00113460** JUDGE GREGORY H. LEWIS DEPT. C26 |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Drew E. Pomerance, Esq.  SBN 113540                          (818) 992-9991
Roxborough, Pomerance & Nye
5820 Canoga Avenue, Suite 250
Woodland Hills, CA  91367

MELISSA WILSON

DATE: **OCT 20 2008**  ALAN CARLSON        Clerk, by _____, Deputy
*(Fecha)*                                          *(Secretario)*                          *(Adjunto)*

(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served

1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*
3. ☑ on behalf of *(specify):* *Travelers Casualty and Surety Company of America, a Connecticut corporation*

   under: ☑ CCP 416.10 (corporation)          ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation)   ☐ CCP 416.70 (conservatee)
          ☐ CCP 416.40 (association or partnership)  ☐ CCP 416.90 (authorized person)
          ☐ other *(specify):*
4. ☑ by personal delivery on *(date):*

Page 1 of 1

| | |
|---|---|
| Form Adopted for Mandatory Use Judicial Council of California SUM-100 [Rev. January 1, 2004] | **SUMMONS**    Legal Solutions Plus    Code of Civil Procedure §§ 412.20, 465 |

**EXHIBIT** ____1____
**PAGE** ____5____

10/20/2008  15:22   17145418182          FIRST LEGAL                    PAGE  04/84

1 | Drew E. Pomerance, Esq., State Bar No. 113540
Craig S. Pynes, Esq. State Bar No. 151552
2 | **ROXBOROUGH, POMERANCE & NYE LLP**
5820 Canoga Avenue, Suite 205
3 | Woodland Hills, California 91367
Telephone:  (818) 992-9999
4 | Facsimile:  (818) 992-9991

**FILED**
SUPERIOR COURT OF CALIFORNIA
COUNTY OF ORANGE
CENTRAL JUSTICE CENTER

**OCT 20 2008**

ALAN CARLSON, Clerk of the Court

BY _____M. WILSON_____, DEPUTY

5 | Attorneys for Plaintiffs,
CHILDREN'S HOSPITAL OF ORANGE COUNTY and
6 | CHILDREN'S HOSPITAL AT MISSION

**JUDGE GREGORY H. LEWIS**
**DEPT. C26**

7 |

8 | **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9 | **COUNTY OF ORANGE, CENTRAL JUSTICE CENTER**

**30-2008**

10 | CHILDREN'S HOSPITAL OF ORANGE
11 | COUNTY a California nonprofit public benefit corporation; and CHILDREN'S HOSPITAL
12 | AT MISSION, a California nonprofit public benefit Corporation,

Case No.   **00113460**

13 |                    Plaintiffs,

14 | vs.

15 | TRAVELERS CASUALTY AND SURETY
16 | COMPANY OF AMERICA, a Connecticut corporation; UNITED HEALTH CARE, INC.,
17 | dba UNITED HEALTH GROUP aka UNITED HEALTH CARE INSURANCE COMPANY a
18 | Delaware corporation and DOES 1 through 100, inclusive,

19 |                    Defendants.

20 |

21 |

22 |

23 |

24 |

25 |

**COMPLAINT FOR:**

1. **BREACH OF CONTRACT AGAINST TRAVELERS AND DOES 1 THROUGH 50;**

2. **TORTIOUS BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING AGAINST TRAVELERS AND DOES 1 THROUGH 50;**

3. **DECLARATORY RELIEF AGAINST TRAVELERS AND DOES 1 THROUGH 50;**

4. **BREACH OF CONTRACT AGAINST UNITED HEALTH CARE AND DOES DOES 51 THROUGH 100; AND**

5. **DECLARATORY RELIEF AGAINST UNITED HEALTH CARE AND DOES 51 THROUGH 100.**

**DEMAND FOR JURY TRIAL**

26 |

27 |          PLAINTIFFS, CHILDREN'S HOSPITAL OF ORANGE COUNTY, a California

28 | nonprofit public benefit corporation; and CHILDREN'S HOSPITAL AT MISSION, a California

- 1 -
COMPLAINT

EXHIBIT_____ 1
PAGE _____ 6

1  nonprofit public benefit corporation, allege against DEFENDANTS, TRAVELERS CASUALTY

2  AND SURETY COMPANY OF AMERICA, UNITED HEALTH CARE, INC. and DOES 1

3  through 100, inclusive, as follows:

4  **GENERAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION.**

5     1.    Plaintiff, CHILDREN'S HOSPITAL OF ORANGE COUNTY, a California

6  nonprofit public benefit corporation ("CHOC") is, and at all relevant times to this action was, a

7  corporation organized and existing under the laws of the State of California, and doing business in

8  the City and County of Orange.

9     2.    Plaintiff, CHILDREN'S HOSPITAL AT MISSION, a California nonprofit public

10  benefit corporation ("CHAM" or both plaintiffs collectively "Plaintiffs") is, and at all relevant

11  times to this action was, a corporation organized and existing under the laws of the State of

12  California, and doing business in the City of Mission Viejo, County of Orange.

13    3.    CHOC provides the highest quality medical care to children through its hospital

14  center located in the City of Orange and five (5) community out-patient clinics.

15    4.    CHAM serves as the only dedicated pediatric health care facility for families in

16  South Orange County.

17    5.    Plaintiffs are informed and believe and thereon allege that Defendant

18  TRAVELERS CASULTY AND SURETY COMPANY OF AMERICA ("TRAVELERS") is, and

19  at all relevant times to this action was, a corporation engaged in the business of writing and selling

20  insurance to businesses located in California and is qualified to do business in the State of

21  California, having its principal place of business in Hartford, Connecticut.

22    6.    Plaintiffs are informed and believe and thereon allege that TRAVELERS also

23  adjusts California claims including the present claim made by Plaintiffs described in this

24  Complaint, through TRAVELERS' Diamond Bar, California office.

25    7.    Plaintiffs allege that they entered into the insurance policy with TRAVELERS that

26  provides coverage for certain criminal acts (herein "Crime Policy"), which policy is the subject of

27  this lawsuit and which is described here and below in the County of Orange, State of California.

28  ///

EXHIBIT_____1_____
PAGE_____7_____

1      8.     Plaintiffs further allege that they submitted their claim to TRAVELERS' Diamond

2  Bar, California claims adjustment facility, which has adjusted Plaintiffs' claim.

3      9.     Plaintiffs are unaware of the true names and capacities of those defendants sued as

4  DOES 1 through 50, and they are thus sued under such fictitious names.  Plaintiffs are informed

5  and believe, and thereon allege, that each of these fictitiously-named defendants in some manner

6  acted in conjunction with TRAVELERS to proximately cause the insurance-related damages to

7  Plaintiffs alleged below.  Plaintiffs will seek leave of court to amend this Complaint to allege these

8  defendants' true names and capacities when ascertained as well as other causes of action

9  subsequently discovered.

10     10.    Plaintiffs are informed and believe, and thereon allege, that in performing the acts

11  alleged herein, defendants TRAVELERS and DOES 1 through 50, and each of them, act as each

12  others' agents, servants, joint-venturers, trustees, partners, alter-egos, affiliates, contractors and/or

13  employees of each other and were acting within the course and scope of such agency, contract,

14  service or employment.  Plaintiffs are informed and believe, and thereon allege, that defendants

15  TRAVELERS and DOES 1 through 50 authorized and ratified the acts of each other.

16     11.    Defendant UNITED HEALTH CARE, INC. dba UNITED HEALTH GROUP aka

17  UNITED HEALTH CARE INSURANCE COMPANY ("UNITED") is, and at all relevant times

18  to this action, was a corporation organized and existing under the laws of the State of Delaware,

19  but doing business in the cities of Orange and Mission Viejo, County of Orange, where CHOC

20  and CHAM are located.

21     12.    UNITED manages and maintains managed health care programs, including a health

22  care service plan or HMO, preferred provider organization or PPO and arranges or administers

23  health care services for its plan members.

24     13.    Many of UNITED's health plan members and those for whom health care services

25  were provided by Plaintiffs were located and received hospital medical services out of CHOC and

26  CHAM hospital and health care facilities.

27  ///

28  ///

EXHIBIT _____ *l* _____
PAGE _____ *8* _____

14. As more fully described below, UNITED and Plaintiffs have a contract whereby Plaintiffs provide health care services for UNITED plan members and UNITED reimburses Plaintiffs for those medical services.

15. Plaintiffs are unaware of the true names and capacities of those defendants sued as DOES 51 through 100, and they are thus sued under such fictitious names. Plaintiffs are informed and believe, and thereon allege, that each of these fictitiously-named defendants in some manner acted in conjunction with UNITED to proximately cause the contract-related damages to Plaintiffs alleged below. Plaintiffs will seek leave of court to amend this Complaint to allege these defendants' true names and capacities when ascertained as well as other causes of action subsequently discovered.

16. Plaintiffs are informed and believe, and thereon allege, that in performing the acts alleged herein, defendants UNITED and DOES 51 through 100, and each of them, act as each other's agents, servants, joint-venturers, trustees, partners, alter-egos, affiliates, subsidiaries, contractors and/or employees of each other and were acting within the course and scope of such agency, contract, service or employment. Plaintiffs are informed and believe, and thereon allege, that defendants UNITED and DOES 51 through 100 authorized and ratified the acts of each other.

### VENUE

17. Venue is proper in this judicial district because the performance, breach, and liability for both the insurance-related and contract-related damages alleged in this Complaint as against both sets of defendants and the present dispute alleged herein occurred within the County of Orange, in the jurisdiction of this superior court set forth above.

18. Plaintiffs are further informed and believe, and thereon allege, that the insurance claims and contract claims giving rise to this lawsuit arose in the County of Orange, State of California.

### RELEVANT CONTRACTS BETWEEN PLAINTIFFS AND UNITED.

19. On or about October 1, 1994, Plaintiff CHOC entered into a PPO Provider Agreement with PacifiCare of California, whereby PacifiCare agreed to pay CHOC for its ///

EXHIBIT_____ 1
PAGE_____ 9

1   provision of health care services rendered to PacifiCare plan members at the CHOC hospital

2   facility. A true and correct copy of the provider agreement is attached as Exhibit "A."

3         20.     On or about April 1, 2006, CHOC and PacifiCare entered into a 2006 Amendment

4   to the 1994 PPO Provider Agreement, in which they agreed that the existing agreement would

5   apply not only to PacifiCare business, but would also apply to United Health Group through its

6   merger with PacifiCare and also to members accessing the PacifiCare's PPO network through a

7   new affiliate, United Health Care Insurance Company or one of its affiliates and also applied the

8   agreement to CHAM. A true and correct copy of the 2006 amendment is attached as Exhibit "B."

9                        **RELEVANT INSURANCE POLICY.**

10        21.     Plaintiffs procured from TRAVELERS, a Crime Insurance Policy, policy No.

11  104844036 providing a policy period between <u>November 15, 2007</u> to <u>November 15, 2008</u>. A true

12  and correct copy of the policy is attached as Exhibit "C."

13        22.     In consideration for TRAVELERS providing crime insurance coverage, Plaintiffs

14  paid all premiums due for the policy.

15                        **UNLAWFUL DIVERSION OF CHOC'S FUNDS.**

16        23.     Throughout Plaintiffs' contractual relationship with UNITED, Plaintiffs have

17  furnished medically necessary services to UNITED health plan members and UNITED directed

18  payments due Plaintiffs to lock box addresses located in Southern California in the name of the

19  Plaintiff hospitals as identified in payment instructions sent by Plaintiffs to UNITED.

20        24.     Based on information and belief, UNITED through its wholly-owned subsidiary,

21  Exante Financial Services, Inc. ("Exante"), has an online process, pursuant to which providers

22  may enroll to receive electronic deposit of claims payments from UNITED's subsidiary, Exante,

23  in payment for health care services provided by health care practitioners furnished through various

24  hospitals or medical facilities. UNITED refers to the online payment system as its Electronic

25  Funds Transfer Program ("EFTP").

26        25.     Based upon further information and belief, UNITED's EFTP was highly vulnerable

27  to unfettered access by persons who could potentially scheme to defraud consumers, plans and

28  providers. For instance, UNITED's EFTP had virtually no internal controls protecting against the

EXHIBIT_____ 1
PAGE _____ 10

COMPLAINT

1 illegal diversion of provider payments. While the EFTP requires tax identification numbers as a

2 form of "verification" for enrollment purposes, such information is available to certain members

3 of the public, and is not particularly secure. Further, enrollment in UNITED's EFTP could be

4 accomplished by facsimile, mail or online, but only the facsimile or mail method requires

5 submission of voided checks, whereas the online method did not, which further reduced security.

6     26.     The UNITED EFTP "Enrollment Form" requires that an applicant provide the

7 name and address of the provider, the provider's tax identification number and primary and

8 secondary contact information and identify a depository institution. It also requires an "authorized

9 signature." The enrollment form does not require that documentation verifying the signatory's

10 authorization to act on behalf of the enrolled organization be furnished or that such authorization

11 is verified by UNITED.

12     27.     Further, based on information and belief, UNITED does not require any

13 verification of the EFTP enrollment form by the designated provider contacts and/or signors to the

14 EFTP with UNITED.

15     28.     In or about August, 2007, CHOC employed a temporary employee named Kelly

16 McCowen, in Plaintiffs' accounts receivable department, to help with collections.

17     29.     On or about November 20, 2007, Plaintiffs are informed and believe that Ms.

18 McCowen enrolled CHOC in UNITED's EFTP, using her own personal bank account(s) located

19 in Sioux Falls, South Dakota and/or Memphis, Tennessee to receive UNITED's claim payments.

20     30.     On or about November 28, 2007, Plaintiffs are informed and believe that Ms.

21 McCowen purportedly enrolled CHAM in UNITED's EFTP again using her own personal bank

22 account(s) located in Sioux Falls, South Dakota and/or Memphis, Tennessee to receive UNITED's

23 claim payments.

24     31.     Plaintiffs are informed and believe that, beginning on or about November 29, 2007,

25 UNITED through its subsidiary, Exante, subsequently processed 35 electronic payments which

26 were intended to go to Plaintiffs, and which money belonged to Plaintiffs, but because of Ms.

27 McCowen's actions, were instead diverted to Ms. McCowen's personal bank account(s), identified

28 above, in the total amount of approximately $1,000,465.73.

EXHIBIT_____1_____

PAGE _____11_____

COMPLAINT

1    32.    At no time prior to the above claims payments being issued, were Plaintiffs notified

2  or made aware of the above actions.  Neither the CHOC Board, nor CHOC's Management

3  approved of or ratified Ms. McCowen's actions.

4    33.    When Plaintiffs learned of the unauthorized electronic payment agreements,

5  Plaintiffs immediately requested that they be terminated and that UNITED discontinue all

6  electronic transfers to the fraudulent accounts.

7    34.    On multiple occasions Plaintiffs have demanded that UNITED pay them the

8  outstanding reimbursement monies for Plaintiffs provision of medical and health care services to

9  UNITED's members.

10    35.    UNITED initially promised Plaintiffs that it would make them whole.

11    36.    UNITED, through Exante, subsequently obtained a judgment against Ms.

12  McCowen's estate (McCowen was murdered on April 4, 2008) and froze assets in her bank

13  account(s), which Plaintiffs are informed and believe totals approximately $595,000.00.

14    37.    UNITED has further represented that it would return the frozen assets to Plaintiffs

15  upon UNITED's execution and satisfaction of its judgment.

16    38.    To date, UNITED has yet to reimburse Plaintiffs any of the above monies, more

17  recently asserting that UNITED had paid these monies to Plaintiffs and was not required to

18  reimburse Plaintiffs for monies allegedly stolen by Ms. McCowen.

19    **TRAVELERS' WRONGFUL REFUSAL TO HONOR PLAINTIFFS' CLAIM.**

20    39.    On or about March 20, 2008 Plaintiffs submitted a claim under TRAVELERS'

21  Crime Policy, including a signed and notarized sworn proof of loss and provided attachments

22  required by TRAVELERS substantiating Plaintiffs' claim.

23    40.    On or about April 23, 2008, TRAVELERS responded to Plaintiffs' proof of loss

24  requesting a repeated notarized proof of loss and additional copies of substantiating

25  documentation.  While TRAVELERS' letter purported to reserve its rights on coverage, it did not

26  articulate any grounds in support of its position, nor set forth any reason or basis justifying its

27  delay in providing coverage and paying Plaintiffs' claim.

28  ///

EXHIBIT_____1
PAGE_____12

1    41.    On or about May 12, 2008, Plaintiffs' corporate counsel, Diane Racicot, wrote

2 TRAVELERS enclosing additional documents requested by TRAVELERS to purportedly analyze

3 Plaintiffs' claim under its Crime Policy and explaining why TRAVELERS' Crime Policy covered

4 Plaintiffs' loss.

5    42.    On or about June 17, 2008, TRAVELERS' coverage counsel, David Dibiase, wrote

6 back that TRAVELERS still did not have a final position, continued to investigate the claim and

7 requested yet additional information from Plaintiffs and yet again reserved its coverage defenses

8 and right to deny the claim.

9    43.    On or about September 2, 2008, Plaintiffs retained outside counsel, Drew E.

10 Pomerance, Esq., of Roxborough, Pomerance & Nye, who wrote TRAVELERS' coverage counsel

11 explaining that CHOC's temporary employee's theft of UNITED's payments to Plaintiffs based

12 on a forged electronic funds transfer program enrollment form directly damaged Plaintiffs as

13 UNITED has asserted that it had already remitted the monies to pay Plaintiffs. UNITED's

14 payment reimburses Plaintiffs for health care services provided by various health care practitioners

15 to Plaintiffs' patients who are UNITED plan members. The letter also explained that Ms.

16 McCowen's misappropriation of Plaintiffs' claim payments triggered coverage under multiple

17 insuring clauses in TRAVELERS' Crime Policy, including Coverage A, Fidelity, subpart 1

18 providing coverage for employee theft, Coverage B, Forgery or Alteration, subpart 1 a and b

19 providing coverage for Ms. McCowen's forged electronic instructions to divert the UNITED funds

20 to her own account, and Coverage G, Funds Transfer Fraud, subpart 1-3 providing coverage for

21 losses resulting from Ms. McCowen's provision of fraudulent electronic transfer instructions to

22 Exante to fraudulently divert UNITED claim payments from Plaintiffs' accounts to her personal

23 account(s).

24    44.    On September 12, 2008, TRAVELERS responded through its coverage counsel,

25 Mr. Dibiase, requesting yet further information and documentation, but still making no

26 commitment on satisfying Plaintiffs' claim. Finally, on September 29, 2008, TRAVELERS wrote

27 to Plaintiffs' counsel that it intended to deny coverage. See Exhibit "A".

28 ///

EXHIBIT_____*l*_____
PAGE _____13_____

45.     Despite providing TRAVELERS with all requested loss documentation on multiple occasions, TRAVELERS has wrongfully denied coverage by refusing to honor its Crime Policy with Plaintiffs, thus requiring them to initiate the present lawsuit to recover their claim benefits.

### FIRST CAUSE OF ACTION

**(Breach of Contract Against TRAVELERS and DOES 1 through 50)**

46.     Plaintiffs incorporate herein by this reference all the allegations contained in paragraphs 1 through 22, 28 through 34 and 39 through 45 hereof, as if set forth in full in this First Cause of Action.

47.     Plaintiffs are informed and believe, and thereon allege, that TRAVELERS breached its Crime Policy by failing and refusing to acknowledge Plaintiffs' covered claim under TRAVELERS' multiple insuring clauses, including Coverage A, Fidelity, Employee Theft, Coverage B, Forgery or Alteration and Coverage G, Funds Transfer Fraud and remitting covered proceeds to Plaintiffs to satisfy their claim for theft of their electronic funds.

48.     Plaintiffs have performed all terms of their Crime Policy, including provision to TRAVELERS of all requested loss documentation, sworn proofs of loss and multiple letters from Plaintiffs, their general counsel and outside counsel exhaustively supporting Plaintiffs' covered loss.

49.     As a result of TRAVELERS' breach of its Crime Policy, Plaintiffs have sustained damages in the amount of $1,000,465.73, plus interest.

50.     Plaintiffs are informed and believe, and thereon allege, that TRAVELERS further breached its Crime Policy by refusing to reimburse Plaintiffs for their out-of-pocket attorneys' fees and investigative costs incurred by Plaintiffs in their documented efforts to recover the stolen funds as specifically contemplated by the Crime Policy's Section 1 coverage for Claim Expense.

51.     Plaintiffs are informed and believe, and thereon allege, that a portion of the stolen funds have been identified and frozen in a bank account vested in the estate of Kelly McCowen in the approximate amount of $595,000.00 that will be credited against any recovery in this action, if and when such funds are remitted to Plaintiffs.

///

EXHIBIT _____ 1 _____
PAGE _____ 14 _____

**COMPLAINT**

1    52.    Plaintiffs have previously agreed to assign their interest in the frozen funds to

2  TRAVELERS as a credit against its payment of the covered proceeds.

3    53.    Plaintiffs further allege that as a result of TRAVELERS' breach of contract,

4  Plaintiffs were forced to retain legal counsel to bring this action to enforce their rights and obtain

5  withheld benefits under the Crime Policy.

6  ## SECOND CAUSE OF ACTION

7  **(Tortious Breach of the Implied Covenant of Good Faith and Fair Dealing Against**

8  **TRAVELERS and DOES 1 through 50)**

9    54.    Plaintiffs incorporate herein by this reference as though fully set forth in this Cause

10 of Action, each and every allegation contained in Paragraphs 1 through 22, 28 through 34 and 39

11 through 53, inclusive, of this Complaint as if set forth herein in full.

12    55.    The covenant of good faith and fair dealing is implied by law in every contract to

13 protect each party's right to receive the benefits of the contract.  As a result of engaging in the

14 conduct set forth in this Complaint, TRAVELERS has denied Plaintiffs the benefit of the Crime

15 Policy and thus, breached the implied covenant of good faith and fair dealing by having engaged

16 in and continuing to engage in the following acts and/or omissions which are breaches of implied

17 obligations under the Crime Policy with Plaintiffs as follows:

18              a.    TRAVELERS deliberately ignored letters Plaintiffs forwarded to it setting

19                    forth UNITED's contention that it had paid Plaintiffs the funds at issue that

20                    TRAVELERS knew or should have known substantiated a covered claim under its'

21                    policy;

22              b.    TRAVELERS has wrongfully refused to acknowledge coverage under its

23                    Crime Policy despite Plaintiffs repeatedly submitting supporting loss

24                    documentation, notarized, sworn proofs of loss and all other documentation and

25                    information requested by TRAVELERS that was available to Plaintiffs;

26              c.    TRAVELERS unnecessarily and wrongfully prolonged its investigation of

27                    Plaintiffs' claim knowing it would never honor it and with the sole intention of

28                    needlessly delaying what it knew or should have known was a justified claim;

EXHIBIT _____ 1 _____

PAGE _____ 15 _____

COMPLAINT

d.    TRAVELERS improperly prolonged its claim investigation solely in an effort to undertake a "fishing expedition" to develop some basis to justify denying Plaintiffs' claim despite TRAVELERS knowledge that Plaintiffs had supplied ample documentation supporting coverage; and

e.    TRAVELERS deliberately misconstrued the scope of its coverages addressed above so as to justify its wrongful refusal to honor Plaintiffs' claim.

56.    Plaintiffs are informed and believe, and thereon allege, that TRAVELERS has committed further acts and/or omissions in violation of its duty of good faith and fair dealing. These acts and/or omissions are presently unknown to Plaintiffs and may be discovered by Plaintiffs during the course of this litigation.

57.    As a proximate result of TRAVELERS' conduct, as described hereinabove, Plaintiffs have suffered general and special damages as described hereinabove, including requiring Plaintiffs to incur expense and cost to hire outside consultants, experts and attorneys to assist Plaintiffs to obtain benefits under the Crime Policy.  Pursuant to Travelers' bad faith breach of the Crime Policy, Plaintiffs are entitled to collect all costs and expenses, including attorneys' fees incurred in connection with the collection or enforcement of any obligation owed under the policy.

58.    Plaintiffs further allege that the conduct of TRAVELERS set forth in Paragraph 55 above, was carried out in bad faith, was malicious, fraudulent and oppressive, and evidences a complete disregard for Plaintiffs' interests and intent to injure, harass, vex and annoy Plaintiffs, particularly TRAVELERS' intentional misconduct as evidenced by its refusal to acknowledge UNITED's repeated assertions that it had paid Plaintiffs the funds that McCowen wrongfully diverted, its' repeated unnecessary requests for loss documentation that it already had, and unreasonable delay in acknowledging Plaintiffs' claim solely utilized for the purpose of improperly attempting to develop "after the fact" evidence to support TRAVELERS' improper denial of Plaintiffs' claim.  Under the circumstances described, Plaintiffs allege that TRAVELERS' conduct constitutes "despicable conduct" as defined is California Civil Code §3294 and established common law, thus entitling Plaintiffs to recover punitive damages in an amount appropriate to punish or to set an example of defendants TRAVELERS and DOES 1

EXHIBIT_____/_____
PAGE _____16_____

1  through 50, and each of them. Plaintiffs further allege that TRAVELERS at all times acted

2  through its officers, directors, agents and employees and that they had advance knowledge of the

3  damage being caused to Plaintiffs and that TRAVELERS approved, ordered, instructed,

4  supervised and controlled the conduct of their officers, directors, employees and agents, such as to

5  constitute a ratification of the conduct of said officers, directors, employees and agents.

6  Accordingly, pursuant to the Doctrine of Respondeat Superior, TRAVELERS is liable for punitive

7  damages as prayed for herein.

8  <div align="center">**THIRD CAUSE OF ACTION**</div>

9  <div align="center">**(Declaratory Relief Against TRAVELERS and DOES 1 through 50)**</div>

10      59.    Plaintiffs incorporate by this reference, as though fully set forth in this cause of

11  action, each and every allegation contained in paragraphs 1 through 22, 28 through 34 and 39

12  through 58 inclusive, of this Complaint as though set forth herein in full.

13      60.    By reason of Plaintiffs' allegations set forth in the preceding paragraphs, a

14  controversy has arisen and now exists between Plaintiffs and TRAVELERS. Plaintiffs contend

15  that they own the fraudulently diverted funds and TRAVELERS is required to remit payment

16  under its Crime Policy to satisfy Plaintiffs' claim for the fraudulently diverted funds.

17      61.    Plaintiffs are informed and believe, and based thereon allege, that TRAVELERS

18  disputes the above contention and contends to the contrary.

19      62.    A judicial declaration of the rights and duties of the parties relative to the Crime

20  Policy is necessary to resolve this controversy and to guide the future conduct of the parties.

21  <div align="center">**FOURTH CAUSE OF ACTION**</div>

22  <div align="center">**(Breach of Contract Against UNITED and DOES 51 through 100)**</div>

23      63.    Plaintiffs incorporate herein by this reference all of the allegations contained in

24  Paragraphs 1 through 20 and 23 through 38, inclusive of this Complaint as though set forth herein

25  in full.

26      64.    Plaintiffs are informed and believe, and based thereon allege, that UNITED,

27  through its subsidiary Exante, has established an electronic funds transfer program that is highly

28  vulnerable to unfettered access by persons who can potentially defraud consumers, health care

EXHIBIT_____1_____

PAGE_____17_____

<div align="center">**COMPLAINT**</div>

1   plans and health care providers, such as Plaintiffs. Had UNITED, through its subsidiary Exante,

2   established even a minimum amount of internal controls for its electronic funds transfer program,

3   Ms. McCowen's illegal diversion of provider payments allegedly made by UNITED to Plaintiffs

4   never would have occurred.

5       65.    Plaintiffs are further informed and believe, and thereon allege, that UNITED

6   breached its contract with Plaintiffs through its' failure to properly remit electronic payments in

7   the amount of $1,000,465.73, pursuant to the parties' agreement, to the designated lock box

8   addresses reflected on UNITED's payment requests called remittance advices.

9       66.    Plaintiffs are informed and believe, and thereon allege, that UNITED in further

10  breach of its contract with Plaintiffs improperly misdirected the above electronic funds owing to

11  Plaintiffs to a personal account(s) for Ms. McCowen based on a forged and unauthorized EFTP

12  enrollment forms without UNITED and/or Exante undertaking basic minimum security measures

13  to ensure the validity of the new account enrollment forms and by improperly validating the false

14  information included on the enrollment forms, authenticating that the enrollment forms contained

15  an authorized signature(s) or the designated depository account(s) or undertaking basic measures

16  to ensure the validity of the account enrollment forms, other than requiring tax I.D. information

17  that is publicly available and not following its own procedure to ensure the validity and

18  authenticity of the EFTP enrollments.

19      67.    Plaintiffs have performed all terms under their agreement with UNITED including

20  arranging for provision of the requested health care services to UNITED's plan members and

21  remitting payment for such health care services provided by various health care practitioners.

22      68.    As a result of UNITED's breach of its agreements with Plaintiffs, Plaintiffs' have

23  suffered out of pocket losses of approximately $1,000,465.73, plus interest.

24      69.    Plaintiffs further allege that as a result of UNITED's breach of the parties'

25  agreements, Plaintiffs were forced to retain legal counsel to bring this action to enforce their rights

26  and have incurred and will continue to incur, costs and expenses, including attorneys' fees, that

27  Plaintiffs will seek to recover pursuant to §9.13 of their original agreement specifically providing

28  for recovery of attorneys' fees to the prevailing party in any litigation between the parties as

EXHIBIT_____1_____
PAGE_____18_____

COMPLAINT

1    provided for under California *Civil Code* §1717.

2    <div align="center">**FIFTH CAUSE OF ACTION**</div>

3    <div align="center">**(Declaratory Relief Against Defendant UNITED and DOES 51 through 100)**</div>

4    70.     Plaintiffs incorporate herein by this reference as though fully set forth in this Cause

5    of Action each and every allegation contained in Paragraphs 1 through 20, 23 through 38 and 63

6    through 69, inclusive, of this Complaint as if set forth herein in full.

7    71.     By reason of Plaintiffs' allegations set forth in the preceding paragraphs, a

8    controversy has arisen and now exists between Plaintiffs and UNITED.  Plaintiffs contend as

9    follows:

10            a.     UNITED's payment, through its subsidiary Exante, of funds to a former

11            temporary employee's bank account based on a forged electronic funds transfer

12            program enrollment form does not satisfy UNITED's obligation under the parties'

13            agreement to reimburse Plaintiffs for monies they have incurred out-of-pocket to

14            pay for health care services provided by various health care practitioners for the

15            benefit of UNITED's plan members; and

16            b.     That UNITED is responsible for monies fraudulently diverted which do not

17            reach Plaintiffs' dedicated accounts under the parties' agreements as set forth

18            above.

19    72.     Plaintiffs are informed and believe, and based thereon allege, that UNITED

20    disputes the aforesaid contentions and contends to the contrary.

21    73.     A judicial declaration of the rights and duties of the parties relative to their

22    contract(s) is necessary to resolve this controversy and to guide the future conduct of the parties.

23    **WHEREFORE**, Plaintiffs pray for judgment against Defendants, as follows:

24    <div align="center">**ON THE FIRST CAUSE OF ACTION**</div>

25    <div align="center">**(for Breach of Contract Against TRAVELERS and DOES 1 through 50)**</div>

26    1.     For general and special damages in a sum to be proven at trial.

27    ///

28    ///

EXHIBIT_____1_____
PAGE _____19_____

- 14 -

**COMPLAINT**

1                      **ON THE SECOND CAUSE OF ACTION**

2    **(for Tortious Breach of the Implied Covenant of Good Faith and Fair Dealing Against**

3                  **TRAVELERS and DOES 1 through 50)**

4      1.      For general damages in an amount which exceeds the minimum jurisdictional limits

5 of this Court;

6      2.      For special damages in a sum to be proven at trial;

7      3.      For recovery of all attorneys, experts and consultants' fees, costs and expenses

8 incurred to pursue and obtain the benefits of the Crime Policy; and

9      4.      For punitive and exemplary damages in an amount appropriate to punish or set an

10 example of Defendants TRAVELERS and DOES 1 through 50.

11                      **ON THE THIRD CAUSE OF ACTION**

12        **(for Declaratory Relief Against TRAVELERS and DOES 1 through 50)**

13      1.      For a declaration adjudging that Plaintiffs own the fraudulently diverted funds and

14 TRAVELERS is required to remit payment under its Crime Policy to satisfy Plaintiffs' claim for

15 the fraudulently diverted funds.

16                  **ON THE FOURTH CAUSE OF ACTION**

17        **(for Breach of Contract Against UNITED and DOES 51 through 100)**

18      1.      For general and special damages in a sum to be proven at trial; and

19      2.      For recovery of attorneys' fees pursuant to the parties' contract as permitted under

20 Civil Code §1717.

21                      **ON THE FIFTH CAUSE OF ACTION**

22        **(for Declaratory Relief Against UNITED and DOES 51 through 100)**

23      1.      For a declaration adjudging that UNITED's payment, through its subsidiary

24 Exante, of funds to a former temporary employee's bank account based forged electronic funds

25 transfer program enrollment forms does not satisfy UNITED's obligation under the parties'

26 agreement to reimburse Plaintiffs for monies they have incurred out-of-pocket to pay for health

27 care services provided by various health care practitioners for the benefit of UNITED's plan

28 members; and that UNITED is responsible for monies fraudulently diverted which do not reach

EXHIBIT_____1_____
PAGE _____20_____

1  Plaintiffs' dedicated accounts under the parties' agreement as set forth above.

2  **ON ALL CAUSES OF ACTION**

3       1.     For all costs incurred by Plaintiffs to date and to be incurred by Plaintiffs hereafter

4  in connection with this action; and

5       2.     For such other and further relief as the court deems just and proper.

6

7  DATED: October 15, 2008          ROXBOROUGH, POMERANCE & NYE LLP

8

9  By:_____

10             DREW E. POMERANCE

           CRAIG S. RYNES

11             Attorneys for Plaintiffs CHILDREN'S HOSPITAL

           OF ORANGE COUNTY and CHILDREN'S

12             HOSPITAL AT MISSION

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28                                        EXHIBIT____1____

                                        PAGE ____21____

**COMPLAINT**

1    ## DEMAND FOR JURY TRIAL

2    Plaintiffs CHILDREN'S HOSPITAL OF ORANGE COUNTY and CHILDREN'S

3    HOSPITAL AT MISSION hereby demand a jury trial.

4

5    DATED:  October 15, 2008          ROXBOROUGH, POMERANCE & NYE LLP

6

7                                     By:_____

8                                     DREW E. POMERANCE
                                      CRAIG S. PYNES
9                                     Attorneys for Plaintiffs CHILDREN'S HOSPITAL
                                      OF ORANGE COUNTY and CHILDREN'S
10                                    HOSPITAL AT MISSION

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28                                    EXHIBIT_____1_____
                                      PAGE _____22_____

                            - 17 -
                          **COMPLAINT**

*EX A*

EXHIBIT ___1___
PAGE ___23___

**EXHIBIT A**

PACIFICARE PPO

PROVIDER AGREEMENT

(Facility)

THIS PROVIDER AGREEMENT ("Agreement") is made and entered into as of the Effective Date set forth on the signature page of this Agreement, by and between PacifiCare of California, a California corporation ("PacifiCare"), and the person or entity whose name is listed under the heading "Provider" on the signature page of this Agreement.

R E C I T A L S:

WHEREAS, PacifiCare is a corporation duly organized and existing under and pursuant to the laws of the State of California; and

WHEREAS, Provider is a healthcare or residential facility which is duly licensed by the state in which it operates to provide Health Care Services.

WHEREAS, PacifiCare establishes, manages and maintains managed health care programs, including a health care service plan ("HMO"), preferred provider organization, exclusive provider organization and other similar systems, to arrange or administer quality, cost efficient Health Care Services of selected health care providers, to market and administer the provision of such services and to negotiate agreements with purchasers and providers of such services; and

WHEREAS, PacifiCare desires to engage Provider to furnish Health Care Services on behalf of PacifiCare's managed health care programs, excluding the PacifiCare HMO, and Provider desires to furnish such services under the terms and conditions of this Agreement.

NOW, THEREFORE, in consideration of the mutual promises and covenants herein contained and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

ARTICLE 1

Preamble and Recitals

The preamble and recitals set forth above are hereby incorporated into and made a part of this Agreement.

EXHIBIT_____1_____
PAGE _____24_____



ARTICLE 2

Definitions

2.1  Health Care Services are medical, hospital and other services provided by licensed health care professionals.

2.3  Covered Services are Health Care Services provided pursuant to a Plan.

2.4  Eligible Persons are persons entitled to receive Covered Services pursuant to a Plan.

2.5  PacifiCare Rate Schedule is the rate schedule attached hereto as Exhibit B and incorporated herein.

2.6  Participating Provider is a health care facility, professional medical corporation or partnership and its representatives, or an individual health care provider, including Provider, that has in force and effect an agreement with PacifiCare to perform Covered Services.

2.7  Payor is the purchaser of Covered Services on behalf of Eligible Persons.  Payors include licensed insurance companies, self-insured employer groups, and multi-employer trusts.

2.8  Payor Agreement is an agreement between PacifiCare or PacifiCare's designee and a Payor pursuant to which Participating Providers shall provide Covered Services.

2.9  Payor Summary is the document provided by PacifiCare to Provider specifying for each Payor the terms and conditions for Eligible Persons to receive Covered Services under the applicable Plan.

2.10  Plans are those certain individual and group health and workers' compensation benefit contracts or plans of Payors which shall be subject to this Agreement, including, without limitation, insurance policies, multiple employer trust plan documents, pre-paid plans, governmental programs, and self-insured plans and trusts.

2.11  Provider Manual is the manual of policies, procedures and methods with which Provider shall comply during the term of this Agreement.

2.12  Provider is the person or entity listed under the heading "Provider" on the signature page and all Provider Representatives.

2.13  Provider Representatives are the employees, partners, shareholders, agents and subcontractors of Provider who are

[94]CHOC                    - 2 -                  August 22, 1994

EXHIBIT____|_____
PAGE ____25_____

utilized by Provider to provide or assist Provider in providing Covered Services under this Agreement.

2.14  QA/UR Program is the quality assessment and utilization review program developed, established and administered by PacifiCare, or as otherwise authorized by PacifiCare, for the assessment of the quality and utilization of Covered Services furnished or proposed to be furnished by Participating Providers.  The QA/UR Program is set forth in the Provider Manual and supplemented, where applicable, by the Payor's quality assurance and utilization review programs as set forth in the Payor Summary.

ARTICLE 3

Payor Summaries and Special Agency

3.1  Payor Summaries and PacifiCare Rate Schedule.  Provider accepts and is hereby bound by the PacifiCare Rate Schedule and any Payor Summaries attached hereto.  From time to time, PacifiCare or PacifiCare's designee shall furnish Provider with a new or amended Payor Summary for each Payor which has entered into a Payor Agreement with PacifiCare.  PacifiCare or PacifiCare's designee shall present each new or amended Payor Summary to Provider at least fifteen (15) calendar days prior to the date on which the new or amended Plan is to take effect.  PacifiCare may upon fifteen (15) days prior notice, modify any PacifiCare Rate Schedule with respect to any Payor.  Such modified Rate Schedule shall be deemed effective at the end of the fifteen (15) day notice period.

3.2  Special Agency.  PacifiCare is hereby appointed attorney in fact for Provider for the following limited purposes:

(a)   entering into Payor Agreements;

(b)   obtaining claims from Provider, adjusting such claims pursuant to the PacifiCare Rate Schedule and Payor Summary and submitting adjusted claims information to Payor;

(c)   receiving from Payor, or its agent, payments due Provider for furnishing Covered Services to Eligible Persons;

(d) negotiating such payments by endorsing, by facsimile or otherwise, any such payments made payable to Provider, to PacifiCare or jointly to Provider and PacifiCare; and

(e)   remitting the payment to Provider.

EXHIBIT____1_____
PAGE_____26_____

## ARTICLE 4

### Marketing, Promotion and Administration

4.1  <u>Marketing and Promotion</u>.  PacifiCare shall, within its discretion, use reasonable efforts to solicit Payor Agreements from qualified Payors.

4.2  <u>Participating Provider Network</u>.  PacifiCare or an agent of PacifiCare shall administer and, in its sole discretion, determine the composition of the network of Participating Providers.  PacifiCare shall provide Provider with a list of Participating Providers and shall include Provider's name in the list of Participating Providers distributed to Eligible Persons.

4.3  <u>QA/UR Program</u>.  PacifiCare or an agent of PacifiCare shall:  (i) administer the QA/UR Program and review and analyze (or provide for the review and analysis of) charge data, medical records and other pertinent data of Provider pertaining to Eligible Persons for purposes of the QA/UR Program; and (ii) monitor, by means of the QA/UR Program, the utilization of all services by Provider including, without limitation, all professional and ancillary services and (iii) conduct credentialing of Providers and Providers' Representatives for the purpose of developing and maintaining a quality provider network.

4.4  <u>Payor Programs</u>.  In addition to the QA/UR Program, Payor(s) may require additional quality assurance, utilization review, credentialing, and/or eligibility verification programs to be specified in the Provider Manual or Payor Summary.

## ARTICLE 5

### Obligations of Provider

5.1  <u>Provide Covered Services</u>. Provider shall provide or arrange to Eligible Persons, Covered Services in a prompt and proper manner consistent with community standards for any and all procedures required by the Payor Summary and which Provider is qualified to provide, has the capacity to provide and customarily provides.  Provider's primary concern under this Agreement shall be the quality of services provided to Eligible Persons.  Nothing stated in this Agreement shall be interpreted to diminish this responsibility.

5.2  <u>Standards</u>.  Provider shall comply with the following during the term of this Agreement:

(a)   maintain and demonstrate upon request by PacifiCare that Provider and all Provider Representatives are licensed and accredited, if applicable, and that they meet all other Federal and State regulations or are exempt from compliance

EXHIBIT____1____
PAGE_____27____

with such regulations, including certification under the Medicare Program.

(b) Provider shall notify PacifiCare within fifteen (15) days and hereby authorizes any hospital, governmental agency or professional licensing, accrediting, or certifying authority to notify PacifiCare of any material disciplinary action taken by such entity with respect to Provider, or any malpractice judgment or settlement, which action, judgement or settlement is reported or required to be reported to the agency or organization which authorizes Provider to practice in the State of his or her practice.

(c) Provider shall cooperate with PacifiCare by providing requested assistance and information to assist PacifiCare in credentialing of Providers as further described in the Provider Manual.

5.3 Comply with Provider Manual,Payor Summary and QA/UR Program. Provider shall abide by the Provider Manual, Payor Summary and any and all operating procedures and policies set forth in writing and provided to Provider by PacifiCare or their designees, including, without limitation, the QA/UR Program and any eligibility guarantee programs.

5.4 Obtain Assignment and Disclosure Form. Provider shall assure that a valid assignment of benefits and consent to release of records form is signed by each Eligible Person receiving Covered Services from Provider to permit PacifiCare, Payor, or their designees, to review claims and treatment records.

5.5 Maintain Insurance. Provider shall purchase and maintain, on behalf of itself and all Provider Representatives, at the sole cost and expense of Provider, policies of professional liability insurance in the amount of ten million dollars ($10,000,000) per occurrence. Provider shall also purchase and maintain comprehensive general liability insurance and such other insurance in such amounts as shall be reasonably necessary to insure Provider and Provider's Representatives against any claims arising out of the performance of the duties and obligations of Provider hereunder. Provider shall furnish to PacifiCare or Payor a certificate of insurance policies of Provider, upon the request of PacifiCare or Payor, and shall provide PacifiCare with notification within ten (10) days of any cancellation, termination or material alteration of any such insurance policies.

5.6 Maintain Records; Right to Inspect. Provider shall maintain such books and records as specified in the Provider Manual and as required by state and federal law. Provider shall provide access at reasonable times upon demand by PacifiCare and Payors to inspect such books, papers and records, including but not limited to patient records, relating to the performance of

[94]CHOC                    - 5 -                    August 22, 1994

EXHIBIT_____1_____
PAGE _____28_____

this Agreement by Provider and as necessary for PacifiCare and/or
Payors to implement the QA/UR Program, the credentialing program
and to verify claims submitted by Provider.

## ARTICLE 6

### Compensation and Billing

6.1  Acceptance of Payment.  Upon submission of claims as
set forth in Section 6.2 of this Agreement, Provider agrees to
accept as payment in full for Covered Services, except for
applicable copayments and deductibles, the amount specified in
the PacifiCare Rate Schedule, or as modified from time to time.
Payment shall be made either by PacifiCare on behalf of Payor or
by Payor directly as specified in the applicable Payor Summary.
PacifiCare shall deduct any copayments and deductibles required
by the Plan from the amount set forth in the PacifiCare Rate
Schedule.

6.2  Copayments and Deductibles.  Nothing in this Agreement
shall preclude Provider from collecting directly from Eligible
Persons any copayment or deductible, or from collecting payment
for services which are not covered by the applicable Plan or for
services which are provided to non-eligible persons.  Any such
charges shall be consistent with Provider's usual and customary
fees.

**FILING**

6.3  Claim Submission.  Provider agrees to submit claims to
either PacifiCare or Payor according to the Provider Manual or
the applicable Payor Summary and in any event no later than sixty
(60) days from the date of service.

**Prompt Payment**

6.4  Timing of Payment.  Provider shall be paid within thirty
(30) business days of receipt of properly completed claims.  A
claim will be considered "properly completed" if Provider
complies with the billing procedures set forth in the Provider
Manual and applicable Payor Summary.  Provider shall not seek
payment directly from Eligible Persons unless Provider has first
submitted a claim to PacifiCare or Payor, as designated in the
Payor Summary, and Provider has not received payment within the
period specified above.

6.5  Hold PacifiCare Harmless.  Provider understands that
Payors are solely responsible for payment to Provider for Covered
Services provided to Eligible Persons whether claims are
submitted to and paid by Payor directly or by PacifiCare on
behalf of Payor.  PacifiCare shall not be responsible or liable
for any claims decisions or for any payment of claims submitted
by any Provider.  Provider shall hold PacifiCare harmless in the
event of nonpayment by Payor.

[94]CHOC                    - 6 -                 August 22, 1994

EXHIBIT____I____
PAGE ____29____



**6.6** <u>Coordination of Benefits</u>.  Provider agrees to assist PacifiCare and Payor upon request in coordinating benefits with other payors.  For each Payor, total payments by Payor shall be limited to the amount set forth in the PacifiCare Rate Schedule, unless modified by a Payor Summary.  In the event Provider is entitled to payment from another primary carrier under applicable coordination of benefits rules, the amount payable to Provider under this Agreement shall be the amount set forth in the Rate Schedule, reduced by the amount of the payment due from the primary carrier.


ARTICLE 7

<u>Confidential and Proprietary Information; Non-Competition</u>

**7.1** <u>Confidentiality</u>.  PacifiCare, Payors and Provider shall maintain the confidentiality of medical records and related information in accordance with applicable federal, state and local laws.  PacifiCare and Payors shall use this information only for appropriate insurance, utilization review and quality assurance purposes, unless specifically authorized by Eligible Person.

**7.2** <u>Confidential and Proprietary Information</u>.  Provider agrees to maintain confidential all the following Plan information (the "Confidential Information"): (a) eligibility lists and any other information containing the names, addresses and telephone numbers of Eligible Persons, Payors or employer groups which has been compiled by PacifiCare or Payors;  (b) the Provider Manual; (c) the QA\ UR Program; (d) the Payor Summaries; (e) PacifiCare Rate Schedules; (f) provider lists compiled by PacifiCare or Payors; (g) any copyright, trademark or service mark material of PacifiCare or a Payor, and (h) any other information compiled or created by PacifiCare or Payors which is proprietary to PacifiCare or Payors and which PacifiCare identifies as proprietary in writing.  Provider shall not disclose or use the Confidential Information for its own benefit or gain either during the term of this Agreement or after the date of termination of this Agreement; provided, however, that Provider may use the Confidential Information to the extent necessary to perform its duties under this Agreement or upon express prior written permission of PacifiCare.  Upon the effective date of termination of this Agreement, Provider shall return to Plan the Confidential Information in its possession in a reasonable manner to be specified by PacifiCare.

**7.3** <u>Use of Names</u>.  PacifiCare and Payors shall have the right to use Provider's name, address, and telephone number in any advertising, publication or promotional material to indicate Provider's willingness to provide Covered Services to Eligible Persons pursuant to this Agreement.  Except as provided above, neither party shall use the other party's name, symbols,

EXHIBIT____1____
PAGE____30____

trademarks or service marks in advertising or promotional materials or otherwise without the prior written consent of the other party and shall cease any usage immediately upon written notice of the other party or upon termination of this Agreement, whichever is sooner.

7.4  <u>Covenant Not to Solicit Payors or Eligible Persons</u>. During the term of this Agreement, Provider shall not directly or indirectly: (i) solicit contracts directly with Payors; or (ii) induce an Eligible Person to change group health benefit contracts or Plans.

ARTICLE 8

<u>Term and Termination</u>



8.1  <u>Term</u>.  The initial term of this Agreement ("Initial Term") shall commence on the Effective Date designated on the signature page and shall continue until the first (1st) anniversary thereof and shall be automatically renewed for additional periods of one (1) year (each a "Renewal Term") unless the Agreement is terminated as provided in Sections 8.2 through 8.5 below.

8.2  <u>Termination without Cause</u>.  Either party may terminate this Agreement with or without cause at any time during the Initial Term or any Renewal Term by providing the other party at least ninety (90) days prior written notice.

8.3  <u>PacifiCare Termination for Cause</u>.  This Agreement may be terminated with cause by PacifiCare by giving thirty (30) days prior written notice upon the following occurrences:

a.  Failure of Provider to provide Covered Services in accordance with this Agreement;

b.  Failure of Provider to comply with any material provisions of the Provider Manual and the various Payor Summaries;

c.  Any other material breach of this Agreement by Provider;

d.  Failure to comply with the standards set forth in Section 5.2.

The written notice given pursuant to this Section 8.3 shall contain specific reference to the deficiencies which support the termination notice.  Provider shall have fifteen (15) days to correct such deficiencies to the reasonable satisfaction of PacifiCare; if all deficiencies are corrected within this period, this Agreement shall be reinstated without interruption.

[94]CHOC                    - 8 -                August 22, 1994

EXHIBIT___1___
PAGE_____31___

8.4 <u>Immediate Termination</u>. Notwithstanding Section 8.3, this Agreement may be terminated immediately upon written notice by PacifiCare upon any of the following occurrences:

a. Provider fails to continue to be a duly licensed Provider in good standing;

b. Provider otherwise fails to comply with the standards set forth in Section 5.02;

c. PacifiCare, for good cause, finds that the services rendered to an Eligible Person by Provider do not meet community standards, consisting of accepted, recognized and established practices of Health Care Services in the community in which the Provider is located;

d. Provider materially fails to comply with the QA/UR Program.

8.5 <u>Provider Termination for Cause</u>. This Agreement may be terminated by Provider by giving thirty (30) days prior written notice to PacifiCare if PacifiCare is in breach of any material provision of this Agreement; provided, however, that the termination shall give PacifiCare fifteen (15) days to correct such deficiencies to the reasonable satisfaction of Provider; if all deficiencies are corrected during this period, this Agreement will be reinstated without interruption.

8.6 <u>Payor Termination</u>. Any or all Payors may terminate Provider's participation in the applicable Plan(s) by providing thirty (30) days written notice to Provider. This notice may be provided by Payor or PacifiCare on behalf of Payor.

8.7 <u>Termination of Provider Representative.</u> PacifiCare may terminate immediately upon written notice the participation of any Provider Representative under this Agreement, if such Provider Representative fails to continue to be a duly licensed Provider Representative in good standing or if PacifiCare, for good cause, finds that the services provided to an Eligible Person by a Provider Representative do not meet community standards consisting of accepted, recognized and established practices of Health Care Services in the community in which Provider Representative is located or if Provider Representative materially fails to comply with the QA/UR Program.

8.8 <u>Procedure Upon Termination</u>. Upon the termination of this Agreement by either party for any reason, with or without cause and upon termination of Provider's obligations with respect to any individual Plan pursuant to section 8.6, all rights and obligations hereunder shall cease, except (i) those provided in this Section 8.8, and (ii) those which shall have accrued as a result of the operation of this Agreement. Upon such termination:

EXHIBIT____1_____
PAGE ____32_____

a.  To the extent provided in any Plan and consistent with applicable law and this Agreement, Provider shall remain liable for the provision of and entitled to payment for, Covered Services furnished, subsequent to termination, to Eligible Persons who shall be receiving care or undergoing a course of treatment from Provider at the time of termination until the completion of the care or course of treatment and notice is provided from PacifiCare;

b.  Provider shall immediately discontinue use of any and all signs, plaques, letterheads, forms or other materials identifying Provider as a Participating Provider and return to PacifiCare all originals and copies of confidential information as defined in Section 7.2, in Provider's possession or control; and

c.  If notice of termination is applicable to a specific Payor, Provider shall continue to be fully responsible under the terms of this Agreement for treatment of Eligible Persons enrolled under Plans other than the terminated Plan.

8.9  <u>Termination and Eligible Persons</u>.  In the event of notice of termination of this Agreement and upon actual termination of this Agreement, PacifiCare may direct Eligible Persons to other Participating Providers.

## ARTICLE 9

### Miscellaneous Provisions

9.1  <u>Provider-Patient Relationship</u>.  Nothing in this Agreement shall interfere with or in any way alter any provider-patient relationship and Provider shall have the sole responsibility for the care and treatment of Eligible Persons under Provider's care.

9.2  <u>Non-Exclusivity</u>.  Except as provided in Section 7.4, nothing in this Agreement shall be intended or construed to prevent either party from entering into substantially similar agreements with other entities similar to the other party.

9.3  <u>Independent Contractors</u>.  Each party and its officers, agents and employees are at all times independent contractors to the other party.  Except as otherwise specifically provided herein, nothing in this Agreement shall be construed to make or render either party or any of its officers, agents, or employees, an agent, servant, or employee of, or joint venturer of or with, the other, or to grant Provider any voting, membership or other proprietary right or interest in or to PacifiCare or any of its properties, earnings or profits.

9.4  <u>Notices</u>.  Any notice to be given pursuant to this Agreement by one party to the other shall be in writing and delivered personally, by facsimile transmission or by certified or registered United States mail, return receipt requested,

EXHIBIT_____1_____
PAGE_____33_____

postage prepaid.  Notices shall be delivered or mailed to the parties at the addresses set forth below beneath their respective names.  Each party may change its address by giving notice in accordance with this Section 9.4.  Notices delivered personally or by facsimile transmission shall be deemed received upon actual receipt.  Notices given by certified or registered mail shall be deemed received no later than two (2) United States Postal Service business days after the date of such mailing.  If notice is provided by facsimile transmission, the notice shall be deemed received upon telephone confirmation of receipt of the transmission, provided a copy is also delivered by personal delivery or by the United States Mail.

9.5  <u>Entire Agreement</u>.  This Agreement supersedes any and all other Agreements, whether oral or in writing, between the parties hereto concerning the subject matter herein and contains all of the covenants and agreements between them.  Each party acknowledges that no representation, inducement, promise or agreement orally or otherwise, has been made by any party or anyone acting on behalf of any party, which is not embodied herein.

9.6  <u>Compliance with Terms</u>.  Failure to insist upon strict compliance with any of the terms herein (by way of waiver or breach) by either party hereto shall not be deemed to be  a continuous waiver in the event of any future breach or waiver of any condition hereunder.

9.7  <u>Rights of Parties</u>.  Nothing in this Agreement, whether express or implied, is intended to confer any rights or remedies under or by reason of this Agreement on any persons other than the parties to this Agreement and their respective successors and assigns.

9.8  <u>Assignment</u>.  This Agreement may not be assigned by either Party without the expressed written consent of the other Party.  PacifiCare may assign this Agreement, and/or delegate some or all of the obligations of PacifiCare in this Agreement upon notice to Provider, to a successor in interest or other entity and such assignee shall remain liable for the duties and obligations of PacifiCare hereunder.

9.9  <u>Successors</u>.  This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, personal representatives, executors, administrators, successors and assigns.

9.10  <u>Severability</u>.  If any portions of this Agreement shall, for any reason, be invalid or unenforceable such portions shall be ineffective only to the extent of such invalidity or unenforceability and the remaining portion or portions shall nevertheless be valid, enforceable and of full force and effect.

9.11  <u>Multiple Counterparts</u>.  This Agreement may be executed in multiple counterparts, each of which shall be deemed to be an

EXHIBIT____1____
PAGE_____34____

original and all of which taken together shall constitute a single instrument.

9.12 <u>Conflict of Laws</u>.  This Agreement shall be governed by the laws of the State of California without giving effect to its conflicts of law provisions.

9.13     <u>Attorneys' Fees</u>.  If either party brings legal action relating to this Agreement, the prevailing party shall be entitled to payment by the other of all reasonable attorneys' fees, costs and expenses incurred in such action.

9.14 <u>Amendments</u>.  This Agreement may be amended, effective upon written mutual written agreement between Provider and PacifiCare, except if the amendment is necessary to comply with applicable state regulations and/or laws.  Amendments to the Payor Summaries and PacifiCare Rate Schedule shall be effective as set forth in Section 3.1.  Except as provided in this Section 9.14, no amendments or additions to this Agreement shall be valid unless made in writing and signed by both Provider and PacifiCare.  PacifiCare shall notify Provider, in writing, thirty (30) days prior to any changes in Provider Manual.

EXHIBIT_____1_____
PAGE _____35_____

IN WITNESS WHEREOF, the parties have executed this Agreement on
the date set forth below.

PROVIDER                              PACIFICARE OF CALIFORNIA

_____*Kim C Ely*_____                 By: _____*signature*_____
Signature of Provider of
Authorized Representative

_____*KIM ELY , EXECUTIVE VICE PRESIDENT*_____
Childrens Hospital of Orange County

_____*455 S. MAIN ST.*_____
Address

_____*ORANGE, CA 92668*_____         _____*October 1, 1994*_____
City, State, Zip Code                 Effective Date of Agreement
                                      (to be completed by PacifiCare)

_____*060000011- CA STATE LICENSE*_____
State License, Certificate or
other Authorization Number

_____*95-2331786*_____
Federal Tax I.D. or Social
Security Number

_____*9/30/94*_____
Date Executed by Provider

*(EFF stamp)*

[94]CHOC              $\frac{13}{14}$              August 22, 1994

                                      EXHIBIT____*1*____
                                      PAGE ____*36*____

EXHIBIT_____1_____
PAGE _____37_____

### 2006 AMENDMENT TO 1994 PPO PROVIDER AGREEMENT



This Amendment Number One to PPO Provider Agreement (the "Amendment") is entered into effective as of April 1, 2006 by and between PacifiCare of California, a California corporation ("PacifiCare"), and Children's Hospital of Orange County and Children's Hospital at Mission ("Hospitals"), with respect to the following facts:

### RECITALS

A.     The parties have previously entered into that certain PPO Provider Agreement dated October 1, 1994 (the "Agreement").

B.     The parties agree to amend certain provisions in the existing agreement, effective April 1, 2006.

C.     The parties agree to use best efforts to negotiate and enter into a Children's Hospital of Orange County and Children's Hospital at Mission new United Healthcare Provider Agreement effective January 1, 2007.

NOW, THEREFORE, in consideration of the foregoing, the parties hereto agree that the Agreement is hereby modified as specified below:

1.     The following Sections from Article 8, TERM OF AGREEMENT, of the Agreement are hereby deleted and replaced in their entirety, to read as follows:



8.1     Term. The initial term of this Agreement ("Term") shall be for one year from the effective date of April 1, 2006 of this Agreement. Following the expiration of the initial Term of this Agreement, the Term of this Agreement shall be automatically renewed annually for additional periods of one (1) year, unless either party provides the other with written notice of such party's intention not to extend the term at least one hundred eighty (180) calendar days prior to expiration of the then current term or until this Agreement is appropriately terminated by either party as provided herein.

2.     Hereafter, the existing Children's Hospital of Orange County and Children's Hospital at Mission Hospital Services Agreement applies not only to the PacifiCare business to which it applied prior to PacifiCare's merger with UnitedHealth Group, but also to members accessing a network through the new affiliate, United HealthCare Insurance Company, or one of its affiliates (except for those members who continue to access the CareTrust network while United HealthCare Insurance Company transitions out of its relationship with CareTrust).

3.     Attachment A, Per Diem for Children's Hospital of Orange County and Children's Hospital at Mission, is hereby deleted in its entirety and replaced with a new Per Diem for Children's Hospital of Orange County and Children's Hospital at Mission Exhibit 1, attached hereto and incorporated herein by this reference.

IN WITNESS WHEREOF, the undersigned parties hereby agree to this Amendment as of the date first set forth above.



PACIFICARE OF CALIFORNIA

By:

Name:  Gregory S. Wright

Title: Vice President, Network Management

Date: 3/29/06

HOSPITAL
CHILDREN'S HOSPITAL OF ORANGE COUNTY
AND
CHILDREN'S HOSPITAL AT MISSION

By:

Name:  Kerri Ruppert

Title: Senior Vice President and Chief Financial Officer

Date: 3/24/06

California

EXHIBIT _____ 1 _____
PAGE _____ 39 _____

EXHIBIT____1____
PAGE _____40_____


**TRAVELERS**

November 12, 2007

Vanessa H Settle
PO Box 1840
GLENDALE, CA 91209-1840
(818) 409-4236
(818) 409-426
VSETTLE@travelers.com

Angela Love

HUB INT'L -CULVER CITY
6101 W CENTINELA AVE
STE 210
CULVER CITY. CA 90230-6349

**This is an Agency Billed Policy.**

This is a Policy Change for

**CHILDREN'S HOSPITAL OF ORANGE COUNTY**
455 South Main Street
ORANGE, CA 92868

Brand Type: Crime
Policy Number: 104844036          104642429

Commission: 15.00 %

Policy Period: November 15, 2007     to November 15, 2008
Billing Period: November 15, 2007    to November 15, 2008

Transaction Effective Date: November 15, 2007

| Coverage | Limit | Retention |
|---|---|---|
| Private D & O | Not Covered | |
| EPL | Not Covered | |
| Fiduciary | Not Covered | |
| MPL | Not Covered | |
| Crime | | |
| A1 - Employee Theft | $2,500,000.00 | $50,000.00 |
| A2 - ERISA | $1,000,000.00 | $0.00 |
| A3 - Third Party | Not Covered | |
| K & E | Not Covered | |
| ID Fraud | Not Covered | |

| | Year 1 | Year 2 | Year 3 |
|---|---|---|---|
| Surcharge: | $0.00 | $0.00 | $0.00 |
| Tax: | $0.00 | $0.00 | $0.00 |
| Additional Premium | $0.00 | N/A | N/A |

Comments:

Thank you for placing your business with us.

EXHIBIT _____ 1 _____
PAGE _____ 41 _____

ISSUED BY: Travelers Casualty and Surety Company of America          POLICY NO: 104844036

ISSUED TO: CHILDREN'S HOSPITAL OF ORANGE COUNTY

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

DECLARATIONS CORRECTION/CHANGE ENDORSEMENT

This endorsement modifies the following coverage:

Crime

In consideration of the payment of the premium it is agreed the Item(s) indicated below by ☒ shall amend the corresponding Item(s) in the DECLARATIONS of this Crime Policy:

☒   ITEM 1 NAMED INSURED:

☐   ADDED

☐   DELETED

☒   CHANGED       From: CHILDREN'S HOSPITAL OF ORANGE COUNTY

To: CHILDREN'S HOSPITAL OF ORANGE COUNTY

Principal Address: 455 South Main Street,,ORANGE,CA,ORANGE,92868

☐   ITEM 2 POLICY PERIOD:

Inception Date:                          Expiration Date:
12:01 A.M. standard time both dates at the Principal Address stated in ITEM 1.

☐   ITEM 5 INSURING AGREEMENT(S):

☐   ADDED
☐   DELETED
☐   CHANGED Single Loss Limit(s) of Insurance and/or Single Loss Retention

Insuring Agreement                    Single Loss Limit Of Insurance          Single Loss Retention

EXHIBIT____1____
PAGE ____42____

CRI-7016 (07-05)                                                                 Page 1 of 2

☐   Crime Policy Aggregate Limit of Insurance: ☐ Applicable ☐ Not Applicable

If a Policy Aggregate Limit of Insurance is applicable, then the Policy Aggregate Limit of Insurance for each Policy Period is:                If a Policy Aggregate Limit of Insurance is not included, then this Crime Policy is not subject to a Policy Aggregate Limit of Insurance as set forth in Section V. CONDITIONS B. PROVISIONS AFFECTING LOSS ADJUSTMENT AND SETTLEMENT 1. Limit of Insurance a. Policy Aggregate Limit of Insurance.

☐   ITEM 6 FORMS AND ENDORSEMENTS ATTACHED AT ISSUANCE:

    ☐   ADDED

    ☐   DELETED

    ☐   CHANGED

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the Policy, except as expressly stated herein.  This endorsement is part of the Policy and incorporated herein.

This endorsement is effective at the Inception Date stated in ITEM 2 of the Declarations or effective at 12:01 A.M. on November 15, 2007 , if indicated herein.  Complete the following only when this endorsement is not prepared with the Policy or is to be effective on a date other than the Inception Date of the Policy.

Accepted by:         _____
               On behalf of the entity named in
               ITEM 1 of the Declarations.

               _____
               Authorized Company Representative

EXHIBIT_____l_____
PAGE _____43_____

CRI-7016 (07-05)                                                                                      Page 2 of 2


**TRAVELERS**

## IMPORTANT DISCLOSURE NOTICE OF TERRORISM INSURANCE COVERAGE

On November 26, 2002, President Bush signed into law the Terrorism Risk Insurance Act of 2002 (the "Act"). The Act establishes a short-term program under which the Federal Government will share in the payment of covered losses caused by certain acts of international terrorism. We are providing you with this notice to inform you of the key features of the Act, and to let you know what effect, if any, the Act will have on your premium.

Under the Act, insurers are required to provide coverage for certain losses caused by international acts of terrorism as defined in the Act. The Act further provides that the Federal Government will pay a share of such losses. Specifically, the Federal Government will pay 90% of the amount of covered losses caused by certain acts of terrorism which is in excess of an insurer's statutorily established deductible for that year. The Act also caps the amount of terrorism-related losses for which the Federal Government or an insurer can be responsible at $100,000,000,000.00, provided that the insurer has met its deductible.

Please note that passage of the Act does not result in any change in coverage under the attached policy or bond (or the policy or bond being quoted). Please also note that no separate additional premium charge has been made for the terrorism coverage required by the Act. The premium charge that is allocable to such coverage is inseparable from and imbedded in your overall premium, and is no more than one percent of your premium.

ILT-1018 (9/04)

EXHIBIT_____ l
PAGE _____ 44



## IMPORTANT NOTICE REGARDING INDEPENDENT AGENT AND
## BROKER COMPENSATION

For information on how Travelers compensates independent agents and brokers, please visit www.Travelers.com, or you may request a written copy from Marketing at One Tower Square, 2GSA, Hartford, CT 06183.

ILT-1037 (04-05)

EXHIBIT____ 1
PAGE _____ 45



**TRAVELERS**J

*Wrap* +[SM]

Crime

**DECLARATIONS**                    POLICY NO. 104844036

Travelers Casualty and Surety Company of America
Hartford, CT 06183
(A Stock Insurance Company, herein called the Company)

| ITEM 1 | **NAMED INSURED:**<br>**CHILDREN'S HOSPITAL OF ORANGE COUNTY**<br><br>D/B/A:<br><br><br>Principal Address<br><br>**1109 W. La Veta**<br>**Orange, CA 92668** |
|---|---|
| ITEM 2 | **POLICY PERIOD:**<br>Inception Date: November 15, 2007   Expiration Date: November 15, 2008<br>12:01 A.M. standard time both dates at the Principal Address stated in ITEM 1. |
| ITEM 3 | **ALL NOTICES OF CLAIMS OR LOSS TO THE COMPANY MUST BE ADDRESSED TO:**<br>Travelers Bond<br>Vice President of Claims<br>One Tower Square, 4PB<br>Hartford, CT 06183-9062 |
| ITEM 4 | **COVERAGE INCLUDED AS OF THE INCEPTION DATE IN ITEM 2:**<br><br>[x]  Crime |

EXHIBIT_____I_____
PAGE _____46_____

| ITEM 5 | | | |
|---|---|---|---|
| | **Crime** | | |
| | **Insuring Agreement** | **Single Loss Limit of Insurance** | **Single Loss Retention** |
| | **A. Fidelity** | | |
| | 1. Employee Theft | $2,500,000.00 | $50,000.00 |
| | 2. ERISA Fidelity | $1,000,000.00 | $0.00 |
| | 3. Employee Theft of Client Property | *Not Covered* | |
| | **B. Forgery or Alteration** | $2,500,000.00 | $50,000.00 |
| | **C. On Premises** | $1,000,000.00 | $10,000.00 |
| | **D. In Transit** | $1,000,000.00 | $10,000.00 |
| | **E. Money Orders and Counterfeit Money** | $2,500,000.00 | $50,000.00 |
| | **F. Computer Crime** | | |
| | 1. Computer Fraud | $2,500,000.00 | $50,000.00 |
| | 2. Computer Program and Electronic Data Restoration Expense | $100,000.00 | $10,000.00 |
| | **G. Funds Transfer Fraud** | $2,500,000.00 | $50,000.00 |
| | **H. Personal Accounts Protection** | | |
| | 1. Personal Accounts Forgery or Alteration | $1,000,000.00 | $10,000.00 |
| | 2. Identity Fraud Expense Reimbursement | $25,000.00 | $0.00 |
| | **I. Claim Expense** | $10,000.00 | $0.00 |

If "*Not Covered*" is inserted above opposite any specified Insuring Agreement, or if no amount is included in the Limit of Insurance, such Insuring Agreement and any other reference thereto is deemed to be deleted from this Crime Policy.

Policy Aggregate Limit of Insurance: ☐ Applicable          ☒ Not Applicable
If a Policy Aggregate Limit of Insurance is applicable, then the Policy Aggregate Limit of Insurance for each Policy Period is:
If a Policy Aggregate Limit of Insurance is not included, then this Crime Policy is not subject to a Policy Aggregate Limit of Insurance as set forth in Section V. CONDITIONS B. PROVISIONS AFFECTING LOSS ADJUSTMENT AND SETTLEMENT 1. Limit of Insurance a. Policy Aggregate Limit of Insurance.

**Cancellation of Prior Insurance:**
By acceptance of this **Crime Policy**, you give us notice canceling prior policies or bonds issued by us that are designated by policy or bond numbers **104642429,**
such cancellation to be effective at the time this **Crime Policy** becomes effective.

| ITEM 6 | **FORMS AND ENDORSEMENTS ATTACHED AT ISSUANCE:**<br>ILT-1018-0904; ILT-1037-0405; CRI-3001-0705; CRI-5005-0705; CRI-7008-0705; CRI-7088-0207;<br>CRI-7028-0706 |
|---|---|

The Declarations, the Application, the Crime Terms and Conditions, any purchased Insuring Agreements, and any endorsements attached thereto, constitute the entire agreement between the Company and the Insured.

Countersigned By
(where applicable)

CRI-2001-0705

EXHIBIT ___1___
PAGE ___47___



**TRAVELERS**                                                              Wrap+ ^SM
                                                                          Crime

### CRIME TERMS AND CONDITIONS
### PLEASE READ ALL TERMS AND CONDITIONS CAREFULLY

Throughout this **Crime Policy** the words "you" and "your" refer to the **Insured**. The words "we", "us" and "our" refer to the Company providing this insurance.

### CONSIDERATION CLAUSE

IN CONSIDERATION of the payment of the premium by you, and pursuant to the terms stated herein, we will pay you for direct loss that you sustain which is directly caused by a **Single Loss** taking place at any time and which is **Discovered** by you during the **Policy Period** or during the Extended Period to Discover Loss pursuant to the terms set forth in Section V. CONDITIONS A. GENERAL CONDITIONS 3. Extended Period to Discover Loss.

### I.    INSURING AGREEMENTS

This **Crime Policy** shall provide coverage under each of the following Insuring Agreements.  Notwithstanding the aforesaid, if ITEM 5 of the Declarations indicates that any Insuring Agreement is "*Not Covered*," then such Insuring Agreement and any other reference thereto is deemed to be deleted from this **Crime Policy**.

### A.    FIDELITY

#### 1.    Employee Theft

We will pay you for your direct loss of, or your direct loss from damage to, **Money, Securities and Other Property** directly caused by **Theft** or **Forgery** committed by an **Employee**, whether identified or not, acting alone or in collusion with other persons.

#### 2.    ERISA Fidelity

We will pay you for direct loss of, or direct loss from damage to, **Money, Securities and Other Property** that belongs to an **Employee Benefit Plan**, directly caused by **Theft** or **Forgery** committed by a **Fiduciary**, whether identified or not, acting alone or in collusion with other persons.

#### 3.    Employee Theft of Client Property

We will pay you for direct loss of, or direct loss from damage to, **Money, Securities and Other Property** sustained by your **Client**, directly caused by **Theft** or **Forgery** committed by an identified **Employee**.

### B.    FORGERY OR ALTERATION

We will: .

1.    pay you for your direct loss directly caused by **Forgery** or alteration of, on or in any written **Covered Instruments** that are:

   a.    made by, drawn by, or drawn upon, you, or purported to have been so made or drawn; or

   b.    made or drawn by one acting as your agent, or purported to have been so made or drawn;  and

2.    reimburse you for reasonable legal defense expenses that you have paid if you are sued for refusing to pay any written **Covered Instrument** under this Insuring Agreement B. on the basis that it has been **Forged** or altered.  Reimbursement of such legal expenses is conditioned upon your receipt of our prior written consent to defend against such suit.  The amount of any legal expenses reimbursed under Insuring Agreement B. is in addition to the applicable Single Loss Limit of Insurance for Insuring Agreement B.

CRI-3001 (07-05)                                                      Page 1 of 21

EXHIBIT ____ /
PAGE ____ 48

A signature that is a mechanical or electronic reproduction of a handwritten signature produced by a mechanical check-writing machine or a computer printer shall be treated the same as a handwritten signature. An Electronic Signature is not treated the same as a mechanical or electronic reproduction of a handwritten signature and is not a **Forgery** under this Insuring Agreement B.

For purposes of this Insuring Agreement B., the term check includes a substitute check as defined in the Check Clearing for the 21st Century Act, and will be treated the same as the original it replaced.

C.     ON PREMISES

We will pay you for:

     1.     your direct loss of **Money** and **Securities** located inside the **Premises** or **Banking Premises** directly caused by **Theft**, committed by a person present inside such **Premises** or **Banking Premises**;

     2.     your direct loss of **Money** and **Securities** located inside the **Premises** or **Banking Premises** directly caused by disappearance or destruction;

     3.     your direct loss of, or your direct loss from damage to, **Other Property** located inside the **Premises**:

         a.     directly caused by an actual or attempted **Robbery**; or

         b.     in a safe or vault, directly caused by an actual or attempted **Safe Burglary**; and

     4.     your direct loss from damage to the **Premises** or its exterior resulting directly from an actual or attempted **Theft**, **Robbery** or **Safe Burglary**, if you are the owner of the **Premises** or are liable for damage to it; or

     5.     your direct loss of, or loss from damage to, a locked safe, vault, cash register, cash box or cash drawer located inside the **Premises** resulting directly from an actual or attempted **Theft**, **Robbery** or **Safe Burglary**, if you are the owner of the locked safe, vault, cash register, cash box or cash drawer or are liable for damage thereto.

D.     IN TRANSIT

     1.     We will pay you for your direct loss of **Money** and **Securities** directly caused by **Theft**, disappearance or destruction while in transit outside the **Premises** and in the care and custody of:

         a.     a **Messenger**, including while temporarily within the living quarters of a **Messenger**; or

         b.     an armored motor vehicle company.

     2.     We will pay you for your direct loss of, or your direct loss from damage to, your **Other Property** directly caused by an actual or attempted **Robbery** while in transit outside the **Premises** and in the care and custody of:

         a.     a **Messenger**; or

         b.     an armored motor vehicle company.

     3.     We will pay you for your direct loss of, or your direct loss from damage to, your **Other Property** directly caused by an actual or attempted **Theft** of your **Other Property** while it is temporarily within the living quarters of a **Messenger**.

Coverage under this Insuring Agreement D. begins immediately upon receipt of the **Money**, **Securities** or **Other Property** by the transporting party and ends immediately upon delivery to the designated recipient or its agent.

E.     MONEY ORDERS AND COUNTERFEIT MONEY

We will pay you for your direct loss directly caused by your good faith acceptance of:

     1.     original money orders, issued or purportedly issued by any post office, express company or bank located in the United States of America, its territories and possessions, Canada, or any other country in which you maintain a physical **Premises**, that are not paid upon presentation; or

CRI-3001 (07-05)

EXHIBIT_____ / _____
PAGE _____ 49 _____

2. **Counterfeit Money**, of the United States of America, its territories and possessions, Canada, or any other country in which you maintain a physical **Premises**, that is acquired during the regular course of business;

in exchange for merchandise, **Money** or services.

F. COMPUTER CRIME

1. Computer Fraud

We will pay you for your direct loss of, or your direct loss from damage to, **Money**, **Securities** and **Other Property** directly caused by **Computer Fraud**.

2. Computer Program and Electronic Data Restoration Expense

We will pay you for reasonable **Restoration Expense** that you incur to restore or replace damaged or destroyed **Computer Programs** or **Electronic Data** stored within your **Computer System** directly caused by a **Computer Violation**.

For purposes of this Insuring Agreement F.2., a **Single Loss** involving **Computer Program** and **Electronic Data Restoration Expense** applies to reasonable **Restoration Expense** incurred by you between the time you **Discover** the damage or destruction and the time your **Computer Program** or **Electronic Data** is restored to the level of operational capability that existed immediately preceding a **Computer Violation**. Recurrence of the same **Computer Virus** after your **Computer Program** or **Electronic Data** has been restored shall constitute a separate **Single Loss**.

Payment of reasonable **Restoration Expense** applies:

a. only to **Computer Programs** and **Electronic Data** which you own or for which you are legally liable; and

b. only if you are unable to reproduce such **Computer Programs** or **Electronic Data** from back-up data copies.

Payment of reasonable **Restoration Expense** will be made to you upon the completion of the restoration of the damaged or destroyed **Computer Programs** or **Electronic Data**.

If a **Single Loss** is covered under both Insuring Agreements F.1. and F.2., then only the Retention for a **Single Loss** under Insuring Agreement F.1. shall be applicable and the payment of **Restoration Expense** under Insuring Agreement F.2. shall be part of, and not in addition to, the Single Loss Limit of Insurance for Insuring Agreement F.1.

G. FUNDS TRANSFER FRAUD

We will pay you for your direct loss of **Money** and **Securities** contained in your **Transfer Account** on deposit at a **Financial Institution** directly caused by **Funds Transfer Fraud**.

H. PERSONAL ACCOUNTS PROTECTION

1. Personal Accounts Forgery or Alteration

We will pay you, on behalf of your **Management Staff Member**, for loss incurred by your **Management Staff Member**, directly caused by **Forgery** or alteration of, on or in any written **Covered Personal Instruments** that are:

a. drawn upon personal accounts of your **Management Staff Member**, or purported to have been so drawn; or

b. made or drawn by one acting as an agent of your **Management Staff Member**, or purported to have been so made or drawn.

A signature that is a mechanical or electronic reproduction of a handwritten signature produced by a mechanical check-writing machine or a computer printer shall be treated the same as a handwritten signature. An **Electronic Signature** is not treated the same as a mechanical or electronic reproduction of a handwritten signature and is not a **Forgery** under this Insuring Agreement H.

For purposes of this Insuring Agreement H.1. the term check includes a substitute check as defined in the Check Clearing for the 21st Century Act, and will be treated the same as the original it replaced.

2.      Identity Fraud Expense Reimbursement

We will reimburse you, on behalf of your **Management Staff Member**, for **Identity Fraud Expense** incurred by your **Management Staff Member** as a direct result of any **Identity Fraud**.

I.      CLAIM EXPENSE

We will pay you for reasonable **Claim Expenses** incurred and paid by you to establish the existence, amount and preparation of your proof of loss in support of a covered claim for loss under any Insuring Agreement of this **Crime Policy**.

The following conditions specifically apply to this Insuring Agreement I.:

1.      any **Claim Expenses** payable to you are only applicable to any covered loss which exceeds the Single Loss Retention amount for the Insuring Agreement that is the subject of a claim under this **Crime Policy**;

2.      **Claim Expenses** that are payable to you are part of and not in addition to the Single Loss Limit of Insurance for the Insuring Agreement that is the subject of a claim under this **Crime Policy**; and

3.      **Claim Expenses** payable to you will be paid to you at the same time as the payment of the valid and collectible loss under the Insuring Agreement that is the subject of a claim under this **Crime Policy**.

II.     **GENERAL AGREEMENTS**

A.      JOINT INSURED

1.      If the **Named Insured** consists of more than one entity, then the **Named Insured** will act for itself and for every other **Insured** for all purposes of this **Crime Policy**. If the **Named Insured** consists of more than one entity and the first entity named in ITEM 1 of the Declarations ceases to be covered, then the next entity will act for itself and for every other **Insured** for all purposes of this **Crime Policy**.

2.      If any **Insured**, partner, or **Management Staff Member** of that **Insured**, has knowledge of any information relevant to this **Crime Policy**, that knowledge is considered knowledge of every **Insured**.

3.      An **Employee** of any **Insured** is considered to be an **Employee** of every **Insured**.

4.      We will not pay you more for loss or losses sustained by more than one **Insured** than the amount we would pay if all loss or losses had been sustained by one **Insured**.

5.      Payment by us to the **Named Insured** for loss sustained by any **Insured**, or payment by us to the **Employee Benefit Plan** for loss sustained under Insuring Agreement A.2, shall fully release us on account of such loss.

6.      If this **Crime Policy** or any of its Insuring Agreements are canceled or terminated as to any **Insured**, loss sustained by that **Insured** is covered only if **Discovered** by you during the period of time provided in the Extended Period To Discover Loss pursuant to the terms set forth in Section V. CONDITIONS A. GENERAL CONDITIONS 3. Extended Period to Discover Loss; provided, this Extended Period to Discover Loss terminates as to that **Insured** immediately upon the effective date of any other insurance obtained by that **Insured** replacing in whole or in part the insurance afforded by this **Crime Policy**, whether or not such other insurance provides coverage for loss sustained prior to its effective date.

B.      ADDITIONAL OFFICES

If you establish any additional offices, other than by consolidation with, merger with, purchase of, or acquisition of assets or liabilities of another organization while this **Crime Policy** is in effect, such offices are automatically covered by this **Crime Policy** from the date of such establishment without the requirement of notice to us or the payment of additional premium for the remainder of the **Policy Period**.

C.      CONSOLIDATION, MERGER OR PURCHASE OF ASSETS

If, during the **Policy Period**, you merge with, purchase or acquire the assets or liabilities of another entity, this **Crime Policy** will provide coverage for that merged, purchased, or acquired entity, subject to all other terms and conditions herein, but only for loss

CRJ-3001 (07-05)                                                    Page 4 of 21

EXHIBIT_____1_____
PAGE _____51_____

Discovered by you after the effective date of such merger, purchase, or acquisition; provided, you give us written notice of such merger, purchase, or acquisition, and specific application has been submitted on our form in use at the time, together with such documentation and information as we may require, all within ninety (90) days after the effective date of such merger, purchase, or acquisition. Coverage for the merged, purchased, or acquired entity shall not be afforded following such 90-day period unless we have agreed to provide such coverage, subject to any additional terms and conditions as we may require, and the Named Insured has paid us any additional premium as may be required by us. Any Employee Benefit Plan or Sponsored Plan acquired as above shall be included as Insureds as specified in Item 1 of the Declarations.

The 90-day notice requirement shall not apply, provided: (1) the assets of the merged, purchased, or acquired entity do not exceed twenty-five percent (25%) of the total assets of all Insureds as reflected in the Insured's most recent fiscal year-end financial statement, or (2) the merger, purchase, or acquisition occurs less than ninety (90) days prior to the end of the Policy Period.

D.    ACQUISITIONS

If, during the Policy Period, you acquire or form a Subsidiary, this Crime Policy will provide coverage for such Subsidiary and its respective Management Staff Members, Employee Benefit Plans, and Sponsored Plans, subject to all other terms and conditions of this Crime Policy, provided written notice of such acquisition or formation has been given to us, and specific application has been submitted on our form in use at the time, together with such documentation and information as we may require, all within ninety (90) days after the effective date of such acquisition or formation. Coverage for such Subsidiary shall not be afforded following such 90-day period unless we have agreed to provide such coverage, subject to any additional terms and conditions as we may require, and you have paid us any additional premium as may be required by us.

The 90-day notice requirement shall not apply provided that: (1) the assets of the acquired or formed Subsidiary do not exceed twenty-five percent (25%) of your total assets as reflected in your most recent fiscal year-end financial statement; or (2) the acquisition or formation occurs less than ninety (90) days prior to the end of the Policy Period

E.    CHANGE OF CONTROL – NOTICE REQUIREMENTS

When you learn that a Change of Control has taken place as to any Insured, or will take place during the Policy Period, you must give us written notice within ninety (90) days of the effective date of such Change of Control.

III.    DEFINITIONS

Wherever appearing in this Crime Policy, the following words and phrases appearing in bold type shall have the meanings set forth in this Section III. DEFINITIONS:

A.    "Banking Premises" means the interior of that portion of any building occupied by a banking institution or similarly recognized place of safe deposit, including any night depository chute of such institution.

B.    "Change of Control" means:

1.    the acquisition of any Insured, or of all or substantially all of its assets, by another entity, or the merger or consolidation of any Insured into or with another entity such that the Insured is not the surviving entity; or

2.    the obtaining by any person, entity or affiliated group of persons or entities of the right to elect, appoint or designate more than fifty percent (50%) of the board of directors or board of managers or to exercise a majority control of the board of directors, board of managers, or a functional equivalent thereof of any Insured.

C.    "Claim Expenses" means reasonable fees, costs and expenses of outside accountants, attorneys, consultants or experts retained by you to determine the amount and extent of loss covered under this Crime Policy. The reasonableness of such expenses shall be determined by us. The phrase does not mean or include any of your internal corporate fees, costs (direct or indirect), obligations or Employee wages and salaries.

D.    "Client" means an entity specifically scheduled as a Client by endorsement to this Crime Policy for which you perform services as specified in a written agreement, but only while the written agreement is in effect.

E.    "Client's Premises" means the interior of that portion of any building your Client occupies in conducting its business.

F.    "Computer Fraud" means:

CRI-3001 (07-05)

EXHIBIT _____1_____

PAGE _____52_____

The use of any computer to fraudulently cause a transfer of Money, Securities or Other Property from inside the Premises or
Banking Premises:

    1.    to a person (other than a Messenger) outside the Premises or Banking Premises; or

    2.    to a place outside the Premises or Banking Premises.

G.    "Computer Program" means a set of related electronic instructions which direct the operations and functions of a
Computer System or devices connected to it which enable the Computer System or devices to receive, process, store, retrieve, send,
create or otherwise act upon Electronic Data.

H.    "Computer System" means a computer and all input, output, processing, storage and communication facilities and
equipment which are connected to such a device and which the operating system or application software used by the Insured are
under the direct operational control of the Insured.  Off-line media libraries are deemed to be part of such Computer System.

I.    "Computer Violation" means:

    1.    a Computer Virus designed to damage or destroy a Computer Program or Electronic Data; or

    2.    vandalism by a natural person, including an Employee, who has gained unauthorized electronic access to your
Computer System.

J.    "Computer Virus" means a set of unauthorized instructions, programmatic or otherwise:

    1.    directed solely against the Insured; and

    2.    that propagate themselves through the Computer System or networks;

provided such instructions were maliciously introduced by a natural person.

K.    "Counterfeit" means an imitation of Money that is intended to deceive and to be taken as genuine.

L.    "Covered Instruments" means:

    1.    checks, drafts, promissory notes, bills of exchange or similar written promises, orders or directions to pay a sum
certain in Money; and

    2.    written instruments required in conjunction with any transaction involving any Credit, Debit or Charge Card
issued to you, your Employees or your Management Staff Members for business purposes.

M.    "Covered Personal Instruments" means:

    1.    checks, drafts, promissory notes or similar written promises, orders or directions to pay a sum certain in Money;
and

    2.    written instruments required in conjunction with any transaction involving any Credit, Debit or Charge Card
issued to a Management Staff Member for personal use.

N.    "Credit, Debit or Charge Card" means any card, plate or other similar device used for the purpose of obtaining Money,
property, labor or services on credit or for immediate payment.  The terms do not mean a note, check, draft, money order or other
negotiable instrument.

O.    "Crime Policy" means, collectively, the Declarations, the Application, the Crime Terms and Conditions, and any
endorsements attached thereto.

P.    "Digital Signature" means an electronic identifier created by computer, within, attached to or logically associated with a
record and executed or adopted by a person with the intent to sign the record.

Q.    "Discover", "Discovered", or "Discovery" means the moment when you, your partner or Management Staff Member:

EXHIBIT_____1_____
PAGE _____53_____

1.   first become(s) aware of facts which would cause a reasonable person to assume that a loss of a type covered by this Crime Policy has been or will be incurred, regardless of when the act or acts causing or contributing to such loss occurred, even though the exact details of loss may not then be known; or

2.   first receive(s) notice of an actual or potential claim against you alleging facts which if true would constitute a loss under this Crime Policy.

R.   "Electronic Computer Instructions" means a set of related programs that direct the operations and functions of a Computer System and allow such system to act upon or create Electronic Data.

S.   "Electronic Data" means facts or information converted to a form:

1.   usable in a Computer System;

2.   which does not provide instructions or directions to a Computer System; or

3.   which is stored on electronic processing media for use by a Computer Program.

T.   "Electronic Signature" means a Digital Signature, an electronic sound, symbol or process, within, attached to, or logically associated with a record and executed or adopted by a person with the intent to sign the record.

U.   "Employee" means:

1.   any natural person:

a.   while in your service or for sixty (60) days after termination of service, unless such termination is due to Theft or Forgery or any other dishonest act committed by the Employee;

b.   who you compensate directly by salary, wages or commissions; and

c.   who you have the right to direct and control while performing services for you;

2.   any natural person who is temporarily furnished to you:

a.   to substitute for an Employee as set forth in paragraph 1. above, who is on leave; or

b.   to meet seasonal or short-term workload conditions;

while that person is subject to your direction and control and performing services for you; provided, any such natural person who has care and custody of property outside the Premises is specifically excluded from this definition;

3.   any natural person, other than a temporary Employee described in paragraph 2. above, who is leased to you under a written agreement between you and a labor leasing firm, while that person is subject to your direction and control and performing services for you;

4.   any natural person:

a.   who is a member of the board of directors, member of the board of trustees or LLC Manager while acting as a member of any of your elected or appointed committees, including but not limited to any member of such committee, to perform on your behalf, specific, as distinguished from general, directorial acts;

b.   who is a non-compensated officer;

c.   other than a non-compensated fund solicitor, while performing services for you that are usual to the duties of an Employee or officer;

d.   while acting as a non-compensated fund solicitor during fund raising campaigns;

e.   who is a former Employee, member of the board of directors, partner, LLC Manager, or member of the board of trustees retained as a consultant while that person is subject to your direction and control and performing services for you;

CRJ-3001 (07-05)                                                                 Page 7 of 21

EXHIBIT____I____
PAGE____54____

f.      who is a guest student or intern pursuing studies or duties in any of your offices or Premises; while such person is subject to your direction and control and performing services for you; or

5.      any attorney retained by you, while performing legal services for you.

"Employee" does not mean any agent, broker, factor, commission merchant, consignee, independent contractor or representative or other person of the same general character not specified in paragraphs 1. through 5. above.

V.      "Employee Benefit Plan" means an employee welfare benefit plan or an employee pension benefit plan as more fully set forth in Title 1, Section 3 of the Employee Retirement Income Security Act of 1974 (ERISA) and any amendments thereto and which is solely sponsored by any Insured.

W.      "Fiduciary" means any natural person who is a trustee, an officer, an Employee or an administrator of any Employee Benefit Plan; and any person, or a member of the board of directors, an officer, an Officer-Shareholder, a member of the board of trustees, an LLC Manager, or an Employee while that person is handling Money, Securities and Other Property that belongs to any Employee Benefit Plan.

Fiduciary does not mean any agent, broker, independent contractor, broker/dealer, registered representative, investment advisor, custodian or other person or entity of the same general character.

X.      "Financial Institution" means:

1.      a bank, savings bank, credit union, savings and loan association or similar thrift institution; or

2.      a stock brokerage firm, mutual fund, liquid assets fund or similar investment institution;

where you maintain a Transfer Account.

Y.      "Forgery", or "Forged" means the signing of the name of another person or organization with a handwritten signature physically affixed directly to Covered Instruments or Covered Personal Instruments, without authority and with the intent to deceive; it does not mean a signature which consists in whole or in part of one's own name signed with or without authority in any capacity, for any purpose.

Z.      "Funds Transfer Fraud" means:

1.      an electronic, telegraphic, cable, teletype or telephone instruction fraudulently transmitted to a Financial Institution directing such institution to debit your Transfer Account and to transfer, pay or deliver Money or Securities from your Transfer Account which instruction purports to have been transmitted by you, but was in fact fraudulently transmitted by someone other than you without your knowledge or consent;

2.      a fraudulent written instruction, other than one covered under Insuring Agreement B., issued to a Financial Institution directing such Financial Institution to debit a Transfer Account and to transfer, pay or deliver Money or Securities from such Transfer Account by use of an electronic funds transfer system at specified intervals or under specified conditions which written instruction purports to have been issued by you but was in fact fraudulently issued, Forged or altered by someone other than you without your knowledge or consent; or

3.      an electronic, telegraphic, cable, teletype, telefacsimile, telephone or written instruction initially received by you which purports to have been transmitted by an Employee, but which was in fact fraudulently transmitted by someone else without your or the Employee's consent.

AA.     "Identity Fraud" means the act of knowingly transferring or using, without lawful authority, a means of identification of a Management Staff Member with the intent to commit, aid, or abet any unlawful activity that constitutes a violation of federal law or a felony under any applicable state or local law.

BB.     "Identity Fraud Expense" means:

1.      costs for notarizing fraud affidavits or similar documents for credit agencies, financial institutions, merchants or other credit grantors that have required that such affidavits be notarized;

CRI-3001 (07-05)

    2.    costs for certified mail to law enforcement agencies, credit agencies, financial institutions, merchants or other credit grantors;

    3.    costs for long distance telephone calls to law enforcement agencies, credit agencies, financial institutions, merchants or other credit grantors to report or discuss any actual **Identity Fraud**;

    4.    lost wages, up to a maximum payment of one thousand dollars ($1,000) per week for a maximum period of five (5) weeks, as a result of absence from employment:

    a.    to communicate with law enforcement agencies, legal counsel, credit agencies, financial institutions, merchants or other credit grantors;

    b.    to complete fraud affidavits or similar documents; or

    c.    due to wrongful incarceration arising solely from someone having committed a crime in the **Management Staff Member's** name; provided, that lost wages shall not apply in the case of wrongful incarceration absent all charges being dismissed or an acquittal;

    5.    loan application fees for re-applying for a loan or loans when the original application is rejected solely because the lender received incorrect credit information;

    6.    reasonable attorney fees incurred, with the our prior written consent, for:

    a.    defense of lawsuits brought against your **Management Staff Member** by financial institutions, merchants, other credit grantors or their collection agencies;

    b.    the removal of any criminal or civil judgments wrongly entered against your **Management Staff Member**; or

    c.    challenging the accuracy or completeness of any information in a consumer credit report; and

    7.    costs for daycare and eldercare incurred solely as a direct result of any **Identity Fraud Discovered** during the **Policy Period**.

**Identity Fraud Expense** does not include any expense or loss not listed in paragraphs 1. through 7. of this Definition BB..

CC.    "Insured" means:

    1.    for the purposes of Insuring Agreement A.2., any **Employee Benefit Plan**; or

    2.    for the purposes of all other Insuring Agreements, the **Named Insured**, any **Subsidiary**, and any **Sponsored Plan**.

DD.    "**LLC Manager**" means any natural person who was, is or becomes a manager, member of the board of managers, or a functionally equivalent executive of a limited liability company.

EE.    "**LLC Member**" means any natural person who has an ownership interest in a limited liability company.

FF.    "**Management Staff Member**" means your proprietor, natural person partner, member of the board of directors, member of the board of trustees, officer, risk manager, in-house general counsel, **LLC Manager**, or **LLC Member**.

GG.    "**Messenger**" means any **Management Staff Member**, or relative thereof, any **Officer-Shareholder**, or any **Employee**, duly authorized, while having care and custody of covered property outside the **Premises**.

HH.    "**Money**" means a medium of exchange in current use and authorized or adopted by a domestic or foreign government, including currency, coins, bank notes, bullion, travelers checks, registered checks and money orders held for sale to the public.

II.    "**Named Insured**" means the entity named in ITEM 1 of the Declarations.

EXHIBIT_____1____
PAGE _____56____

JJ.   "Officer-Shareholder" means any officer who has a twenty-five percent (25%) or greater ownership interest in any one or more Insureds.

KK.   "Other Property" means any tangible property other than Money and Securities that has intrinsic value.

LL.   "Policy Period" means the period from the Inception Date to the Expiration Date set forth in ITEM 2 of the Declarations. In no event shall the Policy Period continue past the effective date of cancellation or termination of this Crime Policy.

MM.   "Premises" means the interior of that portion of any building you occupy in conducting your business.

NN.   "Restoration Expense" means reasonable costs incurred by you to reproduce Computer Programs or Electronic Data and enable you to restore your Computer System to the level of operational capability that existed immediately preceding a Computer Violation.

Restoration Expense does not include:

1.    your internal corporate costs and expenses, including Employee remuneration and any costs related to any legal action;

2.    expenses incurred as a result of the reconstruction of Computer Programs and Electronic Data recorded on media, including but not limited to, magnetic or optical media if there are no analyses files, specifications or backups of Computer Programs or Electronic Data held outside the Premises;

3.    expenses incurred as a result of the reconstruction of Computer Programs and Electronic Data if you knowingly use illegal copies of programs;

4.    expenses incurred to render the Computer Programs and Electronic Data usable by replacement processing equipment;

5.    expenses incurred to design, update or improve Computer Programs or Electronic Data or to perfect their operation or performance;

6.    expenses incurred as a result of alteration in Computer Programs and Electronic Data held on magnetic media due to the effect of magnetic fields, incorrect usage of the Computer Programs and Electronic Data, or the obsolescence of the Computer System;

7.    your lost revenue, sales or profits; or

8.    expenses incurred by any customer.

OO.   "Robbery" means the unlawful taking of Money, Securities and Other Property from the care and custody of you, your partners or any other person (except any person acting as a watchperson or janitor) by one who has:

1.    caused or threatened to cause that person bodily harm; or

2.    committed an unlawful act witnessed by that person.

PP.   "Safe Burglary" means the unlawful taking of:

1.    Money, Securities and Other Property from within a locked safe or vault by a person unlawfully entering the safe or vault as evidenced by marks of forcible entry upon its exterior; or

2.    a safe or vault from inside the Premises.

QQ.   "Securities" means written negotiable and non-negotiable instruments or contracts representing Money or property including but not limited to:

1.    tokens, tickets, revenue and other stamps (whether represented by actual stamps or unused value in a meter) in current use; and

EXHIBIT_____l_____
PAGE _____57_____

2. evidences of debt issued in connection with any Credit, Debit or Charge Card, which is not issued by you;

but does not include Money.

RR. "Single Loss" means:

    1. for purposes of Insuring Agreement A.:

        a. an individual act;

        b. the combined total of all separate acts; or

        c. a series of related acts;

committed by an Employee or committed by more than one Employee acting alone or in collusion with other persons both during and before the Policy Period;

    2. for purposes of Insuring Agreements B. and H.1., all loss caused by any person, or loss in which that person is involved, whether the loss involves one or more written Covered Instruments or Covered Personal Instruments; and

    3. for purposes of all other Insuring Agreements:

        a. any act or series of related acts or events involving one or more persons; or

        b. any act, acts or events involving a person or group of persons acting together;

whether identified or not both during and before the Policy Period.

SS. "Sponsored Plan" means any plan solely sponsored by any Insured that is not subject to the terms of ERISA.

TT. "Subsidiary" means:

    1. any corporation, or any limited liability company, organized under the laws of any state, in which, on or prior to the Inception Date set forth in ITEM 2 of the Declarations, you own, directly or through one or more Subsidiaries, more than fifty percent (50%) of the outstanding securities or voting rights representing the right to vote for the election of, or to appoint such organization's board of directors, board of trustees, board of managers or a functional equivalent thereof, or to exercise a majority control of the board of directors, board of trustees, board of managers or a functional equivalent thereof; or

    2. subject to the provisions set forth in Section II. GENERAL AGREEMENTS D. ACQUISITIONS, any entity that you acquire or form during the Policy Period in which you own, directly or through one or more Subsidiaries, more than fifty percent (50%) of the outstanding securities or voting rights representing the right to vote for the election of, or to appoint such organization's board of directors, board of trustees, board of managers or a functional equivalent thereof, or to exercise a majority control of the board of directors, board of trustees, board of managers or a functional equivalent thereof.

Subsidiary shall not include any entity in which any Insured is engaged as a participant in any type of joint venture unless such entity is specifically scheduled as an additional Named Insured by endorsement to this Crime Policy.

UU. "Theft" means:

    1. under Insuring Agreement A.3., the intentional unlawful taking of Money, Securities and Other Property to the deprivation of a Client;

    2. under Insuring Agreements C. or D., the intentional unlawful taking of Money and Securities to your deprivation.

    3. under all other Insuring Agreements, the intentional unlawful taking of Money, Securities and Other Property to your deprivation.

VV. "Transfer Account" means an account maintained by you at a Financial Institution from which you can initiate the transfer, payment or delivery of Money or Securities:

1.    by means of electronic, telegraphic, cable, teletype, telefacsimile or telephone instructions communicated directly or through an electronic funds transfer system; or

2..    by means of written instructions (other than those described in Insuring Agreements B. and H.1.) establishing the conditions under which such transfers are to be initiated by such Financial Institution through an electronic funds transfer system.

## IV.    EXCLUSIONS

This Crime Policy does not cover:

A.    loss resulting directly or indirectly from war, whether or not declared; civil war; insurrection; rebellion or revolution; military, naval or usurped power; governmental intervention, expropriation or nationalization; or any act or condition related to any of the foregoing;

B.    loss resulting directly or indirectly from seizure or destruction of property by order of governmental authority;

C.    loss resulting directly or indirectly from any fraudulent, dishonest or criminal act committed by you, your natural person partners, any LLC Member or Officer-Shareholder, whether acting alone or in collusion with others; provided, this Exclusion C. shall not apply to loss covered under Insuring Agreement A.2.;

D.    loss resulting directly or indirectly from any other fraudulent, dishonest or criminal act by any Employee or Fiduciary whether acting alone or in collusion with others, unless covered under Insuring Agreements A.1., A.2., A.3., F.2., or H.;

E.    loss resulting directly or indirectly from any Funds Transfer Fraud, unless covered under Insuring Agreements A.1., A.2., A.3., or G.;

F.    loss resulting directly or indirectly from your acceptance of money orders or Counterfeit Money, unless covered under Insuring Agreements A.1., A.2., A.3. or E.;

G.    loss or damages resulting directly or indirectly from the input of Electronic Data by a natural person having the authority to enter the Insured's Computer System, unless covered under Insuring Agreements A.1., A.2., A.3., F.2. or G.;

H.    loss resulting directly or indirectly from forged, altered or fraudulent documents or written instruments used as source documentation in the preparation of Electronic Data, unless covered under Insuring Agreements A.1., A.2., or A.3.;

I.    any expenses incurred by you in establishing the existence or the amount of any loss covered under this Crime Policy, unless covered under Insuring Agreement I.;

J.    loss of income, whether or not earned or accrued, or potential income, including interest and dividends, not realized by you as the result of any loss covered under this Crime Policy;

K.    damages of any type, except your direct compensatory damages resulting from a loss covered under this Crime Policy;

L.    indirect or consequential loss of any nature, including, but not limited to, fines, penalties, multiple or punitive damages;

M.    loss resulting directly or indirectly from any Theft, disappearance, damage, destruction or disclosure of any intangible property or confidential information including:

1.    trade secret information, confidential processing methods or other confidential information or intellectual property of any kind, or Electronic Data unless otherwise covered under Insuring Agreement F.2.; or

2.    Computer Programs;

N.    loss of, or damage to, manuscripts, records, accounts, microfilm, tapes or other records, whether written or electronic, or the cost of reproducing any information contained in such lost or damaged records, except when covered under Insuring Agreements C., D., or F.2.;

O.    loss, or that part of any loss, the proof of which as to its existence or amount is dependent solely upon:

1.    an inventory computation or physical count; or

CRI-3001 (07-05)                                                                                          Page 12 of 21

EXHIBIT_____1_____
PAGE _____59_____

2.    a profit and loss computation;

provided that where you establish wholly apart from such computations or physical count that you have sustained a loss covered under Insuring Agreements A.l., A.2, A.3. or F.l., then you may offer your inventory records and an actual physical count of inventory in support of other evidences as to the amount of loss claimed;

P.    loss resulting directly or indirectly from trading whether or not in the name of the Insured and whether or not in a genuine or fictitious account, unless covered under Insuring Agreement A.1, A.2. and A.3.;

Q.    loss resulting directly or indirectly from fire, except:

l.    loss of or damage to Money or Securities; or

2.    damage to any safe or vault caused by the application of fire thereto in connection with any actual attempted Safe Burglary when covered under Insuring Agreement C.;

R.    loss resulting directly or indirectly from the giving or surrendering of Money, Securities or Other Property in any exchange or purchase, whether or not fraudulent, with any other party not in collusion with an Employee, except when covered under Insuring Agreement E.;

S.    loss of Money, Securities or Other Property while in the custody of any bank, trust company, or similarly recognized place of safe deposit or armored motor vehicle company unless the loss is in excess of the amount recovered or received by you under your contract, if any, with, or insurance carried by, any of the aforementioned;

T.    loss of Money, Securities or Other Property held by an armored motor vehicle company for you and which is stored by such company overnight inside buildings used in the conduct of its business;

U.    loss resulting directly or indirectly from nuclear reaction, nuclear radiation, radioactive contamination, biological or chemical contamination or to any related act or incident;

V.    loss of Money, Securities or Other Property resulting directly or indirectly from kidnap, extortion or ransom payments (other than Robbery) surrendered to any person as a result of a threat;

W.    loss resulting directly or indirectly from Forgery or alteration, except when covered under Insuring Agreements A.1., A.2., A.3., B., or H.;

X.    loss resulting directly or indirectly from Computer Fraud, except when covered under Insuring Agreements A.1., A.2., A.3., F.l., or H.1.;

Y.    loss under Insuring Agreements C. or D. resulting directly or indirectly from:

1.    an accounting or arithmetical error or omission;

2.    the loss of property from within any Money operated device, unless the amount of Money deposited in it is recorded by a continuous recording device;

3.    anyone, acting on your express or implied authority, being induced by any dishonest act to voluntarily part with title to or possession of any property;

4.    damage to motor vehicles, trailers or semi-trailers or equipment and accessories attached to them; or

5.    damage to the Premises or its exterior or to containers of covered property by vandalism or malicious mischief;

Z.    loss resulting directly or indirectly from the diminution in value of Money, Securities or Other Property;

AA.    loss arising from any Credit, Debit or Charge Card if you, your Employee or Management Staff Member has not fully complied with the provisions, conditions or other terms under which any card was issued;

CRJ-3001 (07-05)

EXHIBIT_____1_____
PAGE _____60_____

BB.   loss sustained by any Subsidiary or related Employee Benefit Plan or Sponsored Plan, occurring at any time during which such entity was not a Subsidiary or related Employee Benefit Plan or Sponsored Plan; or

CC.   loss sustained by the Named Insured or any Subsidiary to the extent it results in a benefit, gain or transfer to the Named Insured or any Subsidiary, except to the extent that such loss is covered under Insuring Agreement A.2.

## V.   CONDITIONS

### A.   GENERAL CONDITIONS

#### 1.   Territory Covered

We will cover loss you sustain anywhere in the world, and we will cover all of your offices and Premises, including any additional offices or Premises pursuant to Sections II. GENERAL AGREEMENTS B. ADDITIONAL OFFICES, C. CONSOLIDATION, MERGER OR PURCHASE OF ASSETS, and D. ACQUISITIONS in this Crime Policy.

#### 2.   Cooperation

You must cooperate with us in all matters pertaining to this Crime Policy as stated in its terms, conditions and limitations.

#### 3.   Extended Period to Discover Loss

We will pay you for loss that you sustained prior to the effective date of cancellation or termination of this Crime Policy, which is Discovered by you:

      a.   no later than ninety (90) days from the date of cancellation or termination; and

      b.   as respects any Employee Benefit Plan, no later than one (1) year from the date of cancellation or termination.

Notwithstanding the above, this extended period to Discover loss terminates immediately upon the effective date of any other insurance obtained by you replacing in whole or in part the insurance afforded by this Crime Policy.

#### 4.   Other Insurance

This Crime Policy shall apply only as excess insurance over, and shall not contribute with: (1) any other valid and collectible insurance available to any Insured unless such insurance is written specifically excess of this Crime Policy by reference in such other policy to the Policy Number of this Crime Policy; and (2) indemnification to which any Insured is entitled from any other entity other than any Insured. As excess insurance, this Crime Policy will not apply or contribute to the payment of any loss to you until the amount of such other insurance or indemnity has been exhausted by loss covered thereunder. If the limit of the other insurance or indemnity is insufficient to cover the entire amount of the loss, this Crime Policy will apply to that part of the loss not recoverable or recovered under the other insurance or indemnity. This Crime Policy will not be subject to the terms of any other insurance.

Any loss which is applicable to this Condition A.4. is subject to both the applicable Single Loss Limit of Insurance and applicable Single Loss Retention shown in ITEM 5 of the Declarations.

If this Crime Policy replaces prior insurance that provided you with an extended period of time after the termination or cancellation of such prior insurance in which to Discover loss, then, and only with respect to loss Discovered during such extended period but sustained prior to the termination of such prior insurance, the coverage afforded by this Crime Policy applies as follows:

      a.   we will have no liability for such loss, unless the amount of such loss exceeds the limit of insurance of that prior insurance; provided, that in such case, we will pay you for the excess of such loss subject to the terms and conditions of this Crime Policy; and

      b.   any payment we make to you for such excess loss will not be greater than the difference between the limit of insurance of your prior insurance and the applicable Single Loss Limit of Insurance of this Crime Policy. We will not apply the applicable Single Loss Retention to such excess loss.

#### 5.   Ownership of Property; Interests Covered

CRI-3001 (07-05)

EXHIBIT_____1
PAGE _____61

a.   The property covered under this Crime Policy except as provided in 5.b. below is limited to property:

   i.   that you own or lease;

   ii.   that you hold for others:

      (a)   on your Premises or your Banking Premises; or

      (b)   while in transit and in the care and custody of a Messenger; or

   iii.   for which you are legally liable, except for property located inside the Premises of your client.

Notwithstanding the above, this Crime Policy is for your benefit only and provides no rights or benefits to any other person or organization. Any claim for loss that is covered under this Crime Policy must be presented by you.

b.   If ITEM 5 of the Declarations indicates that coverage under Insuring Agreement A.3. Employee Theft of Client Property has been purchased, then the property covered under Insuring Agreement A.3. is limited to property:

   i.   that your Client owns or leases;

   ii.   that your Client holds for others; or

   iii.   for which your Client is legally liable;

while the property is inside your Client's Premises.

Notwithstanding the above, this Crime Policy is for your benefit only and provides no rights or benefits to any other person or organization, including your Client. Any claim for loss by your Client that is covered under this Crime Policy must be presented by you.

6.   Representation, Concealment, Misrepresentation or Fraud

No statement made by you or on your behalf, whether contained in the Application, underwriting information or otherwise, is deemed to be a warranty of anything except that it is true to the best of the knowledge and belief of the person making the statement.

This Crime Policy is void in any case of fraud by you as it relates to this Crime Policy at any time. This Crime Policy is also void if you or any other Insured, at any time, intentionally conceal or misrepresent a material fact concerning:

a.   this Crime Policy;

b.   the Money, Securities or Other Property;

c.   your interest in the Money, Securities or Other Property; or

d.   a claim under this Crime Policy.

7.   Premiums

The Named Insured is responsible for the payment of all premiums and will be the payee for any return premiums we pay.

8.   Transfer of Rights and Duties Under this Crime Policy

Rights and duties under this Crime Policy may not be transferred without our written consent except in the case of the death of a natural person Insured. If such person dies, then the decedent's rights and duties will be transferred to the decedent's legal representative, but only while acting within the scope of duties as the decedent's legal representative. Until a legal representative is appointed, anyone having proper temporary custody of the decedent's property will have all rights and duties but only with respect to that property.

B.   PROVISIONS AFFECTING LOSS ADJUSTMENT AND SETTLEMENT

CRI-3001 (07-05)

EXHIBIT_____1
PAGE _____62

1. __Limit of Insurance__

    a.    __Policy Aggregate Limit of Insurance__

If ITEM 5 of the Declarations indicates that this Crime Policy includes a Policy Aggregate Limit of Insurance, then our total liability for all loss Discovered during the Policy Period shall not exceed such Policy Aggregate Limit of Insurance. The Policy Aggregate Limit of Insurance shall be reduced by the amount of any payment made under the terms of this Crime Policy. If the Policy Aggregate Limit of Insurance is exhausted by any payment made for loss Discovered during the Policy Period, we will have no further liability for loss regardless of when Discovered and whether or not previously reported to us.

If applicable, the Policy Aggregate Limit of Insurance shall be reinstated to the extent of any net recovery pursuant to Condition B.6. that is received by us during the Policy Period and before the Crime Policy Aggregate Limit of Insurance is exhausted. Recovery from reinsurance or indemnity, or both, for our benefit shall not be deemed a recovery as used herein. In the event that a loss of Securities is settled by us through the use of a Lost Securities Bond, such loss shall not reduce the Crime Policy Aggregate Limit of Insurance, but any payment under the Lost Securities Bond shall reduce the Policy Aggregate Limit of Insurance under this Crime Policy.

The provisions of this Condition B.1.a. shall not be applicable to Insuring Agreement A.2.

If ITEM 5 of the Declarations indicates that this Crime Policy does not include a Crime Policy Aggregate Limit of Insurance, then payment of loss under this Crime Policy shall not reduce the Single Loss Limit of Insurance for other Single Losses.

    b.    __Single Loss Limit of Insurance__

The maximum Single Loss Limit of Insurance for each Insuring Agreement shall not exceed the applicable amount set forth in ITEM 5 of the Declarations for such Insuring Agreement.

    c.    __Special Limit of Insurance for Specified Other Property__

Our liability for loss under Insuring Agreements C. and D. is limited as follows:

    i.    the lesser of twenty-five thousand dollars ($25,000) or the amount shown as the Single Loss Limit of Insurance for any Single Loss involving precious metals, precious or semi-precious stones, pearls, furs, fine art, photographic material, or completed articles made of or containing such enumerated materials that constitute more than half the value of such articles;

    ii.    the lesser of twenty-five thousand dollars ($25,000) or the amount shown as the Single Loss Limit of Insurance for any Single Loss, including damage to manuscripts, drawings or records of any kind, or the cost of reconstructing them or reproducing any information contained in them;

the Special Limit of Insurance for Specified Other Property is part of, and not in addition to, any applicable limit of liability.

    d.    __Identity Fraud Expense Reimbursement Single Loss Limit of Insurance__

The maximum limit of insurance per your Management Staff Member for each Identity Fraud covered under Insuring Agreement H.2. shall not exceed the applicable Single Loss Limit of Insurance stated in ITEM 5 of the Declarations. All acts incidental to an Identity Fraud, any series of Identity Frauds, and all Identity Frauds arising from the same method of operation, whether committed by one or more persons, shall be deemed to arise out of one act and shall be treated as one Identity Fraud. If an act causes a covered loss under Insuring Agreement H.2. to more than one Management Staff Member, the applicable Single Loss Limit of Insurance and Retention under Insuring Agreement H.2. shall apply to each Management Staff Member separately.

    e.    __Loss Covered Under More Than One Insuring Agreement of this Crime Policy__

Subject to any applicable Crime Policy Aggregate Limit of Insurance, if any Single Loss is comprised of loss covered under more than one Insuring Agreement, the most we will pay you for such Single Loss is the lesser of:

    i.    the actual amount of such Single Loss; or

CRI-3001 (07-05)

EXHIBIT_____1____
PAGE _____63

         ii.     the sum of the Single Loss Limits of Insurance applicable to such Insuring Agreements applying to such loss.

2.      **Single Loss Retention**

We will not pay you for any **Single Loss** unless the amount of such **Single Loss** exceeds the Single Loss Retention shown in Item 5 of the Declarations. We will pay you the amount of any **Single Loss** in excess of the Single Loss Retention, up to the Single Loss Limit of Insurance for the applicable Insuring Agreement.

If more than one Single Loss Retention applies to the same **Single Loss**, then only the highest Single Loss Retention shall be applied.

No Single Loss Retention shall apply to any legal expenses paid to you solely under Insuring Agreement B.

3.      **Your Duties in the Event of a Loss**

After you **Discover** a loss or a situation that may result in loss of or loss from damage to **Money, Securities** or **Other Property** that exceeds twenty-five percent (25%) of the Single Loss Retention, you must:

        a.     notify us as soon a possible;

        b.     notify law enforcement authorities if you have reason to believe that any loss, except for loss covered under Insuring Agreements A.1., A.2., A.3., or F.2., involves a violation of law;

        c.     submit to examination under oath at our request and give us a signed statement of your answers;

        d.     give us a detailed, sworn proof of loss within 120 days; and

        e.     cooperate with us in the investigation and settlement of any claim.

Proof of loss under Insuring Agreement B. and H.1. must include: (1) an affidavit of **Forgery** setting forth the amount and cause of loss; and (2) the original written **Covered Instruments** or **Personal Covered Instruments** or a copy of such written instruments.

4.      **Valuation / Settlement**

Subject to the applicable limit of insurance provision (Section V. CONDITIONS B. PROVISIONS AFFECTING LOSS ADJUSTMENT AND SETTLEMENT 1. Limit of Insurance) we will pay you for:

        a.     loss of **Money** but only up to and including its face value, and, at our option, pay for loss of **Money** issued by any country other than the United States of America:

        i.     at face value in the **Money** issued by that country; or

        ii.     in the United States of America dollar equivalent determined by the rate of exchange published in The Wall Street Journal on the day the loss was **Discovered**;

        b.     loss of **Securities** but only up to and including their value at the close of business on the day the loss was **Discovered**, and at our option:

        i.     pay you the value of such **Securities** or replace them in kind, in which event you must assign to us all your rights, title and interest in those **Securities**; or

        ii.     pay the cost of any Lost Securities Bond required in connection with issuing duplicates of the **Securities**; provided, we will be liable only for the cost of the Lost Securities Bond as would be charged for a bond having a penalty not exceeding the lesser of the value of the **Securities** at the close of business on the day the loss was **Discovered**;

        c.     loss of, or loss from damage to, **Other Property** or **Premises** including its exterior for the replacement cost without deduction for depreciation; provided, we will pay you the lesser of the following:

        i.     the applicable Single Loss Limit of Insurance;

        ii.     the cost to replace **Other Property** or **Premises** including its exterior with property of comparable material and quality, and used for the same purpose; or

CRI-3001 (07-05)

EXHIBIT      1
PAGE      64

    iii.  the amount you actually spend that is necessary to repair or replace such property;

provided, we will, at our option, pay you for loss of, or loss from damage to, **Other Property** or **Premises** including its exterior, in the **Money** of the country in which the loss occurred, or in the United States of America dollar equivalent of the **Money** of the country in which the loss occurred determined by the rate of exchange published in The Wall Street Journal on the day the loss was **Discovered.**

We will not pay you on a replacement cost basis for any loss or damage until such property is actually repaired or replaced, and unless the repairs or replacement are made as soon as reasonably possible after the loss or damage. If the lost or damaged property is not repaired or replaced, we will pay you actual cash value on the day the loss was **Discovered.**

Any property that we pay you for or replace becomes our property:

   5.  <u>Records</u>

You must keep records of all **Money, Securities,** and **Other Property** under this Crime Policy so we can verify the amount of any loss.

   6.  <u>Recoveries</u>

    a.  All recoveries for payments made under this **Crime Policy** should be applied, after first deducting the costs and expenses incurred in obtaining such recovery, in the following order of priority:

      i.  first, to you to reimburse you for loss sustained which would have been paid under this **Crime Policy** but for the fact that it is in excess of the applicable Single Loss Limit(s) of Insurance;

      ii.  second, to us in satisfaction of amounts paid or to be paid to you in settlement of your covered claim;

      iii.  third, to you in satisfaction of any Single Loss Retention; and

      iv.  fourth, to you in satisfaction of any loss not covered under this **Crime Policy.**

    b.  The value of all property received by you from any source whatever and whenever received, in connection with any matter from which a loss has arisen, shall be valued as of the date received and shall be deducted from the covered loss.

    c.  Recoveries do not include any recovery:

      i.  from insurance, suretyship, reinsurance, security or indemnity taken for our benefit; or

      ii.  of original **Securities** after duplicates of them have been issued.

   7.  <u>Transfer of Your Rights of Recovery Against Others to Us</u>

You must transfer to us all your rights of recovery against any person or organization for any loss you sustained and for which we have paid or settled. You must also do everything necessary to secure those rights and do nothing after loss to impair them.

   8.  <u>Legal Action Against Us</u>

You may not bring any legal action against us involving loss:

    a.  unless you have complied with all the terms of this **Crime Policy;**

    b.  until ninety (90) days after you have filed proof of loss with us; and

    c.  unless brought within two (2) years from the date you **Discover** the loss.

If any limitation in this Condition B.8. is deemed to be inconsistent with applicable state law, such limitation is amended so as to equal the minimum period of limitation provided by such law.

CRI-3001 (07-05)

9.     Liberalization

If we adopt any revision to the Crime Terms and Conditions of this Crime Policy that would broaden coverage and such revision does not require an additional premium or endorsement and the revision is adopted within forty-five (45) days prior to or during the Policy Period, the broadened coverage will apply to this Crime Policy as of the date the revision is approved for general use by the applicable department of insurance.

C.     EMPLOYEE BENEFIT PLAN PROVISIONS – INFLATION GUARD

In compliance with certain provisions of ERISA:

1.     if any Employee Benefit Plan is insured jointly with any other entity under this Crime Policy, you must select a Single Loss Limit of Insurance for Insuring Agreement A.2. that is sufficient to provide an amount of insurance for each Employee Benefit Plan that is at least equal to that required if each Employee Benefit Plan were insured separately;

2.     if the Named Insured is an entity other than an Employee Benefit Plan, any payment we make to the Named Insured for loss sustained by any Employee Benefit Plan will be held by such Named Insured for the use and benefit of the Employee Benefit Plan(s) sustaining the loss; and

3.     if two or more Employee Benefit Plans are covered under this Crime Policy, any payment we make for loss:

a.     sustained by two or more Employee Benefit Plans; or

b.     of commingled Money, Securities or Other Property of two or more Employee Benefit Plans;

that arises out of a Single Loss is to be shared by each Employee Benefit Plan sustaining loss, in the proportion that the limit of insurance required under ERISA for each such Employee Benefit Plan, bears to the total of those limits of insurance.

4.     If, at the inception date of this Crime Policy, or a preceding policy written by us that provided ERISA fidelity coverage for Employee Benefit Plans, you have or had a Single Loss Limit of Insurance under such ERISA fidelity coverage for Employee Benefit Plans that is or was equal to or greater than the limit of insurance required under ERISA, the Single Loss Limit of Insurance under Insuring Agreement A.2. will equal the greater of the amount of the limit of insurance required by ERISA or the Single Loss Limit of Insurance set forth in the Declarations for Insuring Agreement A.2.

D.     CANCELLATION OR TERMINATION

1.     The Named Insured may cancel:

a.     this Crime Policy in its entirety;

b.     an Insuring Agreement; or

c.     coverage for any Insured;

by mailing or delivering to us advance written notice of cancellation.

2.     We may cancel:

a.     this Crime Policy in its entirety;

b.     an Insuring Agreement; or

c.     coverage for any Insured;

by mailing or delivering to the Named Insured written notice of cancellation at least twenty (20) days before the effective date of cancellation if we cancel for nonpayment of premium; or sixty (60) days before the effective date of cancellation if we cancel for any other reason.

We will mail or deliver our notice to the Named Insured's last mailing address known to us. Notice of cancellation will state the effective date of cancellation and the Policy Period will end on that date. If this Crime Policy or an Insuring Agreement is cancelled,

CRI-3001 (07-05)                                                        Page 19 of 21

EXHIBIT _____ 1 _____
PAGE _____ 66 _____

we will send the Named Insured any premium refund due. If we cancel this Crime Policy, the refund will be pro rata. If the Named Insured cancels, the earned premium will be computed in accordance with the customary short rate table and procedure. The cancellation will be effective even if we have not made or offered a refund. If notice is mailed, proof of mailing will be sufficient proof of notice.

      3.    This Crime Policy terminates:

          a.    in its entirety immediately upon the expiration of the Policy Period;

          b.    in its entirety immediately upon exhaustion of the Policy Aggregate Limit of Insurance, if applicable; provided, that no Crime Policy termination under this Condition D.3.b. shall be effective with respect to any Employee Benefit Plan covered under Insuring Agreement A.2.;

          c.    in its entirety immediately upon the voluntary liquidation or dissolution of the Named Insured; provided, that no Crime Policy termination under this Condition D.3.c. shall be effective with respect to any Employee Benefit Plan covered under Insuring Agreement A.2.; or

          d.    as to any Subsidiary immediately upon the Change of Control of such Subsidiary.

      4.    This Crime Policy terminates as to any Employee:

          a.    as soon as your partner, any of your Management Staff Members or any Employee with managerial or supervisory responsibility not in collusion with the Employee becomes aware of any dishonest or fraudulent employment related act involving an amount in excess of one thousand dollars ($1,000); or

          b.    thirty (30) days after your partner, any of your Management Staff Members or any Employee with managerial or supervisory responsibility not in collusion with the Employee becomes aware of any dishonest or fraudulent non-employment related act; either of which acts were committed by such Employee in your service, during the term of employment by you or prior to employment by you, provided such dishonest or fraudulent non-employment related act involved Money, Securities or Other Property is in an amount in excess of one thousand dollars ($1,000).

E.      CHANGES

Only the Named Insured is authorized to make changes in the terms of this Crime Policy and solely with our prior written consent. This Crime Policy's terms can be changed, amended or waived only by endorsement issued by us and made a part of this Crime Policy. Notice to any representative of yours or knowledge possessed by any agent or by any other person shall not effect a waiver or change to any part of this Crime Policy, or estop us from asserting any right under the terms, conditions and limitations of this Crime Policy, nor may the terms, conditions and limitations hereunder be waived or changed, except by a written endorsement to this Crime Policy issued by us.

F.      ENTIRE AGREEMENT

The Declarations, the Application, the Crime Terms and Conditions, and any endorsements attached thereto, constitute the entire agreement between you and us.

G.      HEADINGS

EXHIBIT ___/___
PAGE ___67___

The titles of the various paragraphs of this Crime Policy and its endorsements are inserted solely for convenience or reference and are not to be deemed in any way to limit or affect the provision to which they relate.

IN WITNESS WHEREOF, the Company has caused this Crime Policy to be signed by its authorized officers at Hartford, CT.


Executive Vice President                                    Corporate Secretary

Includes copyrighted material of Insurance Services Office, Inc., with its permission, and the Surety Association of America.

CRI-3001 (07-05)                                            Page 21 of 21

EXHIBIT_____1_____
PAGE_____68_____

ISSUED BY: Travelers Casualty and Surety Company of America          POLICY NO: 104844036

ISSUED TO: CHILDREN'S HOSPITAL OF ORANGE COUNTY

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

CALIFORNIA CANCELLATION OR TERMINATION

This endorsement modifies insurance provided under the following:
Crime

It is agreed that:

I.     Section V. CONDITIONS, subsection D. CANCELLATION OR TERMINATION is deleted and replaced by the following:

D.     CANCELLATION OR TERMINATION

  1.     The Named Insured may cancel:

     a.     this Crime Policy in its entirety;

     b.     an Insuring Agreement; or

     c.     coverage for any Insured;

by mailing or delivering to us advance written notice of cancellation.

  2.     We may cancel:

     a.     this Crime Policy in its entirety;

     b.     an Insuring Agreement; or

     c.     coverage for any Insured;

by mailing or delivering to the Named Insured, with a copy to the agent or broker of record, written notice of cancellation at least twenty (20) days before the effective date of cancellation if we cancel for nonpayment of premium; or sixty (60) days before the effective date of cancellation if we cancel for any reason as scheduled.  We may cancel for any of the following reasons:

  a)   nonpayment of premium,
  b)   fraud or material misrepresentation by the Named Insured,
  c)   administrative tribunal or court judgment that the Named Insured has violated state law that materially increases risk(s) insured,
  d)   willful or grossly negligent acts or omissions or violation of state safety standards which materially increase the risk(s) insured,
  e)   failure to implement agreed upon loss control measures,
  f)   change in the Named Insured's activities or property of the commercial or industrial enterprise which materially increases risk(s);

We will mail or deliver our notice to the Named Insured's last mailing address known to us.  Notice of cancellation will state the effective date of cancellation and the Policy Period will end on that date.  If this Crime Policy or an Insuring Agreement is cancelled, we will send the Named Insured any premium refund due.  If we cancel this Crime Policy, the refund will be pro rata.  If the Named Insured cancels, the earned premium will be computed in accordance with the customary short rate table and procedure.  The cancellation will be effective even if we have not made or offered a refund.  If notice is mailed, proof of mailing will be sufficient proof of notice.

  3.     This Crime Policy terminates:

     a.     in its entirety immediately upon the expiration of the Policy Period;

CRI-5005 (07-05)                                                                  Page 1 of 2

EXHIBIT _____ 1
PAGE _____ 69

b.     in its entirety immediately upon exhaustion of the Policy Aggregate Limit of Insurance, if applicable; provided, that no **Crime Policy** termination under this Condition D.3.b. shall be effective with respect to any **Employee Benefit Plan** covered under Insuring Agreement A.2.;

c.     in its entirety immediately upon the voluntary liquidation or dissolution of the **Named Insured**; provided, that no **Crime Policy** termination under this Condition D.3.c. shall be effective with respect to any **Employee Benefit Plan** covered under Insuring Agreement A.2.; or

d.     as to any **Subsidiary** immediately upon the **Change of Control** of such **Subsidiary**.

4.     This **Crime Policy** terminates as to any **Employee**:

a.     as soon as your partner, any of your **Management Staff Members** or any **Employee** with managerial or supervisory responsibility not in collusion with the **Employee** becomes aware of any dishonest or fraudulent employment related act involving an amount in excess of one thousand dollars ($1,000); or

b.     thirty (30) days after your partner, any of your **Management Staff Members** or any **Employee** with managerial or supervisory responsibility not in collusion with the **Employee** becomes aware of any dishonest or fraudulent non-employment related act; either of which acts were committed by such **Employee** in your service, during the term of employment by you or prior to employment by you, provided such dishonest or fraudulent non-employment related act involved **Money, Securities** or **Other Property** is in an amount in excess of one thousand dollars ($1,000).

5.     The Company will not be required to renew this **Crime Policy** upon its expiration. If the Company elects not to renew, it will provide to the **Named Insured** written notice to that effect at least sixty (60) days but no more than one hundred twenty (120) days before the Expiration Date set forth in ITEM 2 of the Declarations.

Nonrenewal notice is not required if:
a)  transfer or renewal of a policy without changes is between the Company and insurers of the same group;
b)  extensions of ninety (90) days or less;
c)  the **Named Insured** has obtained or agreed to obtain replacement coverage within sixty (60) days of termination;
d)  for sixty (60) day policies where notice of renewal is given at the time the policy was issued;
   a.  the **Named Insured** requests a change in terms, conditions or risk covered by the policy within sixty (60) days prior to the end of the policy period; or
   b.  the **Named Insured** has made a written offer sixty (60) days prior to the end of the policy term to renew under different terms.

Any notice of cancellation or nonrenewal will be sent by certified mail to the **Named Insured**, with a copy to the agent or broker of record, at the last mailing address known to us.

Mailing time must be added to the notice period as follows:
a)  add five (5) days when mailing to an addressee in California
b)  add ten (10) days for an addressee outside of California; or
c)  add twenty (20) days for an addressee outside of the United States.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above mentioned Policy, except as expressly stated herein. This endorsement is effective at the Inception Date stated in ITEM 2 of the Declarations and this endorsement is part of such Policy and incorporated therein.

EXHIBIT____ i
PAGE _____ 70

ISSUED BY: Travelers Casualty and Surety Company of America      POLICY NO: 104844036

ISSUED TO: CHILDREN'S HOSPITAL OF ORANGE COUNTY

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### EXCLUDE SPECIFIED PROPERTY

This endorsement modifies the following coverage:

**Crime**

In consideration of the payment of the premium, it is agreed:

With respect to any Insuring Agreement listed in the SCHEDULE below there shall be no coverage and this Crime Policy shall not respond to any loss of any Property listed in such SCHEDULE:

### SCHEDULE

| INSURING AGREEMENT(S) | Title |
|---|---|
| A | Employee Theft |

Property Not Covered
Exclude narcotics or any controlled substance

CRI-7008 (07-05)

EXHIBIT _____ 1
PAGE _____ 71

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned Crime Policy, except as expressly stated herein.  This endorsement is part of such Crime Policy and incorporated therein.

This endorsement is effective at the Inception Date stated in ITEM 2 of the Declarations or effective at 12:01 A.M. on November 15, 2007 , if indicated herein.  Complete the following only when this endorsement is not prepared with the policy or is to be effective on a date other than the Inception Date of the policy.

Accepted by:        _____

                  On behalf of the entity named in
                  ITEM I of the Declarations.

                  _____

                  Authorized Company Representative

CRI-7008 (07-05)

EXHIBIT _____ 1
PAGE _____ 72

ISSUED BY: Travelers Casualty and Surety Company of America          POLICY NO: 104844036

ISSUED TO: CHILDREN'S HOSPITAL OF ORANGE COUNTY

### THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

### CALIFORNIA PREMIUM ENDORSEMENT

This endorsement modifies the following coverage:

**Crime**

It is agreed that solely with respect to the coverage shown above, in compliance with the ruling of the Commissioner of Insurance of the State of California and the Opinion of the Attorney General requiring that the premium for all bonds and policies be endorsed thereon, it is hereby noted that the basic premium charged for the attached policy for the period from November 15, 2007 to November 15, 2008 is $14,439.00

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein.  This endorsement is part of such policy and incorporated therein.

This endorsement is effective at the Inception Date stated in ITEM 2 of the Declarations or effective at 12:01 A.M. on November 15, 2007, if indicated herein.  Complete the following only when this endorsement is not prepared with the policy or is to be effective on a date other than the Inception Date of the policy.

Accepted by:  _____

              On behalf of the entity named in
              ITEM 1 of the Declarations.

              _____

              Authorized Company Representative

CRI-7088 (02-07)

EXHIBIT_____1_____
PAGE _____73_____

ISSUED BY: Travelers Casualty and Surety Company of America          POLICY NO: 104844036

ISSUED TO: CHILDREN'S HOSPITAL OF ORANGE COUNTY

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### ADDITIONAL INSUREDS

This endorsement modifies the following coverage:

Crime

It is agreed that solely with respect to the coverage shown above, the following are included as Insureds under the attached Crime **Policy:**

    Children's Healthcare of Ca


Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

This endorsement is effective at the Inception Date stated in ITEM 2. of the Declarations or effective at 12:01 A.M. on 11/15/2007 , if indicated herein. Complete the following only when this endorsement is not prepared with the policy or is to be effective on a date other than the Inception Date of the policy

Accepted by: _____

        On Behalf of the Named Insured
        ITEM 1 of the Declarations.

        _____
        Authorized Company Representative

CRI-7028 (07-06)

EXHIBIT_____1_____
PAGE_____74_____

1


**TRAVELERS** J

## IMPORTANT DISCLOSURE NOTICE OF TERRORISM INSURANCE COVERAGE

On November 26, 2002, President Bush signed into law the Terrorism Risk Insurance Act of 2002 (the "Act"). The Act establishes a short-term program under which the Federal Government will share in the payment of covered losses caused by certain acts of international terrorism. We are providing you with this notice to inform you of the key features of the Act, and to let you know what effect, if any, the Act will have on your premium.

Under the Act, insurers are required to provide coverage for certain losses caused by international acts of terrorism as defined in the Act. The Act further provides that the Federal Government will pay a share of such losses. Specifically, the Federal Government will pay 90% of the amount of covered losses caused by certain acts of terrorism which is in excess of an insurer's statutorily established deductible for that year. The Act also caps the amount of terrorism-related losses for which the Federal Government or an insurer can be responsible at $100,000,000,000.00, provided that the insurer has met its deductible.

Please note that passage of the Act does not result in any change in coverage under the attached policy or bond (or the policy or bond being quoted). Please also note that no separate additional premium charge has been made for the terrorism coverage required by the Act. The premium charge that is allocable to such coverage is inseparable from and imbedded in your overall premium, and is no more than one percent of your premium.

ILT-1018 (9/04)

EXHIBIT_____1_____
PAGE_____75_____



## IMPORTANT NOTICE REGARDING INDEPENDENT AGENT AND BROKER COMPENSATION

For information on how Travelers compensates independent agents and brokers, please visit www.Travelers.com, or you may request a written copy from Marketing at One Tower Square, 2GSA, Hartford, CT 06183.

ILT-1037 (04-05)

EXHIBIT_____1_____
PAGE _____76_____



**TRAVELERS**

*Wrap* ✈ SM

Crime

**DECLARATIONS**

**POLICY NO. 104844036**

Travelers Casualty and Surety Company of America
Hartford, CT 06183
(A Stock Insurance Company, herein called the Company)

| ITEM 1 | **NAMED INSURED:**<br>**CHILDREN'S HOSPITAL OF ORANGE COUNTY**<br><br>D/B/A:<br><br><br>Principal Address<br>**1109 W. La Veta**<br>**Orange, CA 92668** |
|---|---|
| ITEM 2 | **POLICY PERIOD:**<br>Inception Date: November 15, 2007   Expiration Date: November 15, 2008<br>12:01 A.M. standard time both dates at the Principal Address stated in ITEM 1. |
| ITEM 3 | **ALL NOTICES OF CLAIMS OR LOSS TO THE COMPANY MUST BE ADDRESSED TO:**<br>Travelers Bond<br>Vice President of Claims<br>One Tower Square, 4PB<br>Hartford, CT 06183-9062 |
| ITEM 4 | **COVERAGE INCLUDED AS OF THE INCEPTION DATE IN ITEM 2:**<br><br>☒ **Crime** |

EXHIBIT _____ 1 _____
PAGE _____ 77 _____

| ITEM 5 | | | |
|---|---|---|---|
| | **Crime** | | |
| | **Insuring Agreement** | **Single Loss Limit of Insurance** | **Single Loss Retention** |
| | **A. Fidelity** | | |
| | 1. Employee Theft | $2,500,000.00 | $50,000.00 |
| | 2. ERISA Fidelity | $1,000,000.00 | $0.00 |
| | 3. Employee Theft of Client Property | *Not Covered* | |
| | **B. Forgery or Alteration** | $2,500,000.00 | $50,000.00 |
| | **C. On Premises** | $1,000,000.00 | $10,000.00 |
| | **D. In Transit** | $1,000,000.00 | $10,000.00 |
| | **E. Money Orders and Counterfeit Money** | $2,500,000.00 | $50,000.00 |
| | **F. Computer Crime** | | |
| | 1. Computer Fraud | $2,500,000.00 | $50,000.00 |
| | 2. Computer Program and Electronic Data Restoration Expense | $100,000.00 | $10,000.00 |
| | **G. Funds Transfer Fraud** | $2,500,000.00 | $50,000.00 |
| | **H. Personal Accounts Protection** | | |
| | 1. Personal Accounts Forgery or Alteration | $1,000,000.00 | $10,000.00 |
| | 2. Identity Fraud Expense Reimbursement | $25,000.00 | $0.00 |
| | **I. Claim Expense** | $10,000.00 | $0.00 |

If "*Not Covered*" is inserted above opposite any specified Insuring Agreement, or if no amount is included in the Limit of Insurance, such Insuring Agreement and any other reference thereto is deemed to be deleted from this Crime Policy.

Policy Aggregate Limit of Insurance: ☐ Applicable        ☒ Not Applicable
If a Policy Aggregate Limit of Insurance is applicable, then the Policy Aggregate Limit of Insurance for each Policy Period is:
If a Policy Aggregate Limit of Insurance is not included, then this Crime Policy is not subject to a Policy Aggregate Limit of Insurance as set forth in Section V. CONDITIONS B. PROVISIONS AFFECTING LOSS ADJUSTMENT AND SETTLEMENT 1. Limit of Insurance a. Policy Aggregate Limit of Insurance.

**Cancellation of Prior Insurance:**
By acceptance of this Crime Policy, you give us notice canceling prior policies or bonds issued by us that are designated by policy or bond numbers 104642429,
such cancellation to be effective at the time this Crime Policy becomes effective.

| ITEM 6 | **FORMS AND ENDORSEMENTS ATTACHED AT ISSUANCE:**<br>ILT-1018-0904; ILT-1037-0405; CRI-3001-0705; CRI-5005-0705; CRI-7008-0705; CRI-7088-0207; CRI-7028-0706 |
|---|---|

The Declarations, the Application, the Crime Terms and Conditions, any purchased Insuring Agreements, and any endorsements attached thereto, constitute the entire agreement between the Company and the Insured.

Countersigned By
(where applicable)
CRI-2001-0705

EXHIBIT_____1____
PAGE _____78____

**TRAVELERS J**

Wrap+ SM

Crime

## CRIME TERMS AND CONDITIONS
## PLEASE READ ALL TERMS AND CONDITIONS CAREFULLY

Throughout this Crime Policy the words "you" and "your" refer to the Insured. The words "we", "us" and "our" refer to the Company providing this insurance.

**CONSIDERATION CLAUSE**

IN CONSIDERATION of the payment of the premium by you, and pursuant to the terms stated herein, we will pay you for direct loss that you sustain which is directly caused by a **Single Loss** taking place at any time and which is **Discovered** by you during the **Policy Period** or during the **Extended Period to Discover Loss** pursuant to the terms set forth in Section V. CONDITIONS A. GENERAL CONDITIONS 3. Extended Period to Discover Loss.

**I.      INSURING AGREEMENTS**

This **Crime Policy** shall provide coverage under each of the following Insuring Agreements.  Notwithstanding the aforesaid, if ITEM 5 of the Declarations indicates that any Insuring Agreement is "*Not Covered*," then such Insuring Agreement and any other reference thereto is deemed to be deleted from this **Crime Policy**.

**A.      FIDELITY**

**1.      Employee Theft**

We will pay you for your direct loss of, or your direct loss from damage to, **Money, Securities** and **Other Property** directly caused by **Theft** or **Forgery** committed by an **Employee**, whether identified or not, acting alone or in collusion with other persons.

**2.      ERISA Fidelity**

We will pay you for direct loss of, or direct loss from damage to, **Money, Securities** and **Other Property** that belongs to an **Employee Benefit Plan**, directly caused by **Theft** or **Forgery** committed by a **Fiduciary**, whether identified or not, acting alone or in collusion with other persons.

**3.      Employee Theft of Client Property**

We will pay you for direct loss of, or direct loss from damage to, **Money, Securities** and **Other Property** sustained by your **Client**, directly caused by **Theft** or **Forgery** committed by an identified **Employee**.

**B.      FORGERY OR ALTERATION**

We will:

**1.**      pay you for your direct loss directly caused by **Forgery** or alteration of, on or in any written **Covered Instruments** that are:

**a.**      made by, drawn by, or drawn upon, you, or purported to have been so made or drawn; or

**b.**      made or drawn by one acting as your agent, or purported to have been so made or drawn;  and

**2.**      reimburse you for reasonable legal defense expenses that you have paid if you are sued for refusing to pay any written **Covered Instrument** under this Insuring Agreement B. on the basis that it has been **Forged** or altered.  Reimbursement of such legal expenses is conditioned upon your receipt of our prior written consent to defend against such suit.  The amount of any legal expenses reimbursed under Insuring Agreement B. is in addition to the applicable **Single Loss Limit of Insurance** for Insuring Agreement B.

CRI-3001 (07-05)

EXHIBIT_____1
PAGE _____79

## PROOF OF SERVICE

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

I am employed in the County of Los Angeles, State of California.  I am over the age of eighteen years and not a party to the within action; my business address is Thirty-First Floor, 444 South Flower Street, Los Angeles, California 90071-2901.

On November 18 , 2008, I served the following document(s) described as **NOTICE OF REMOVAL** on the interested parties in this action by placing true copies thereof enclosed in sealed envelopes addressed as follows:

Drew E. Pomerance, Esq.                    Attorneys for
Craig S. Pynes, Esq.                       Plaintiffs Children's
Roxborough Pomerance & Nye, LLP            Hospital of Orange
5820 Canoga Ave., Suite 250                County and Children's
Woodland Hills, CA  91367                  Hospital at Mission
Tel: (818) 992-9999
Fax: (818) 992-9991

**BY MAIL:**  I am "readily familiar" with Anderson, McPharlin & Conners' practice for collecting and processing correspondence for mailing with the United States Postal Service.  Under that practice, it would be deposited with the United States Postal Service that same day in the ordinary course of business.  Such envelope(s) were placed for collection and mailing with postage thereon fully prepaid at Los Angeles, California, on that same day following ordinary business practices.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.  Executed on November 18 , 2008, at Los Angeles, California.

Bette Barraclough

---

ANDERSON, McPHARLIN & CONNERS LLP
LAWYERS
444 SOUTH FLOWER STREET, THIRTY-FIRST FLOOR
LOS ANGELES, CALIFORNIA 90071-2901
TEL (213) 688-0080 • FAX (213) 622-7594

707285.1 2985.518

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

## NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge James V. Selna and the assigned discovery Magistrate Judge is Robert N. Block.

The case number on all documents filed with the Court should read as follows:

## SACV08- 1307 JVS (RNBx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

================================================

### NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| [ ] **Western Division** | [X] **Southern Division** | [ ] **Eastern Division** |
|---|---|---|
| **312 N. Spring St., Rm. G-8** | **411 West Fourth St., Rm. 1-053** | **3470 Twelfth St., Rm. 134** |
| **Los Angeles, CA 90012** | **Santa Ana, CA 92701-4516** | **Riverside, CA 92501** |

Failure to file at the proper location will result in your documents being returned to you.

2985-518

**UNITED STAT** **)ISTRICT COURT, CENTRAL DISTRIC** **? CALIFORNIA**
CIVIL COVER SHEET

| I (a) PLAINTIFFS (Check box if you are representing yourself ☐ ) | DEFENDANTS |
|---|---|
| CHILDREN'S HOSPITAL OF ORANGE COUNTY, a California nonprofit public benefit corporation; et al. | TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA, a Connecticut corporation; UNITED HEALTH CARE, INC., etc., et al. |

| (b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.) | Attorneys (If Known) |
|---|---|
| DREW E. POMERANCE ROXBOROUGH POMERANCE & NYE, LLP 5820 CANOGA AVE., SUITE 250 WOODLAND HILLS, CA 91367 TELEPHONE: (818) 992-9999 | DAVID T. DiBIASE ANDERSON, McPHARLIN & CONNERS LLP 444 S. FLOWER STREET THIRTY-FIRST FLOOR LOS ANGELES, CA 90071-2901 TELEPHONE: (213) 688-0080 |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff  ☐ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant  ☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☒ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☐ 1 Original Proceeding  ☒ 2 Removed from State Court  ☐ 3 Remanded from Appellate Court  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from another district (specify):  ☐ 6 Multi-District Litigation  ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☒ Yes ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes ☒ No   ☒ **MONEY DEMANDED IN COMPLAINT: $** 1,000,465.73

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)

28 U.S.C §§ 1332 and 1441 - Diversity Jurisdiction.

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☒ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 530 General | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 535 Death Penalty | |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | | ☐ 540 Mandamus/ Other | ☐ 740 Railway Labor Act |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | | ☐ 345 Marine Product Liability | **BANKRUPTCY** | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 480 Consumer Credit | ☐ 151 Medicare Act | ☐ 350 Motor Vehicle | ☐ 422 Appeal 28 USC 158 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 490 Cable/Sat TV | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 355 Motor Vehicle Product Liability | ☐ 423 Withdrawal 28 USC 157 | **FORFEITURE/ PENALTY** | **PROPERTY RIGHTS** |
| ☐ 810 Selective Service | | ☐ 360 Other Personal Injury | **CIVIL RIGHTS** | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 850 Securities/Commodities/ Exchange | ☐ 153 Recovery of Overpayment of Veteran's Benefits | | ☐ 441 Voting | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 160 Stockholders' Suits | ☐ 362 Personal Injury- Med Malpractice | ☐ 442 Employment | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| | ☐ 190 Other Contract | ☐ 365 Personal Injury- Product Liability | ☐ 443 Housing/Acco- mmodations | | **SOCIAL SECURITY** |
| ☐ 890 Other Statutory Actions | ☐ 195 Contract Product Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | | ☐ 861 HIA (1395ff) |
| ☐ 891 Agricultural Act | ☐ 196 Franchise | | ☐ 445 American with Disabilities - Employment | ☐ 630 Liquor Laws | ☐ 862 Black Lung (923) |
| ☐ 892 Economic Stabilization Act | **REAL PROPERTY** | **IMMIGRATION** | | ☐ 640 R.R. & Truck | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 893 Environmental Matters | ☐ 210 Land Condemnation | ☐ 462 Naturalization Application | ☐ 446 American with Disabilities - Other | ☐ 650 Airline Regs | ☐ 864 SSID Title XVI |
| ☐ 894 Energy Allocation Act | ☐ 220 Foreclosure | ☐ 463 Habeas Corpus- Alien Detainee | ☐ 440 Other Civil Rights | ☐ 660 Occupational Safety/Health | ☐ 865 RSI (405(g)) |
| ☐ 895 Freedom of Info. Act | ☐ 230 Rent Lease & Ejectment | ☐ 465 Other Immigration Actions | | ☐ 690 Other | **FEDERAL TAX SUITS** |
| ☐ 900 Appeal of Fee Determi- nation Under Equal Access to Justice | ☐ 240 Torts to Land | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 245 Tort Product Liability | | | | ☐ 871 IRS - Third Party 26 USC 7609 |
| | ☐ 290 All Other Real Property | | | | |

**SACV08-1307 JVS (RNBx)**

FOR OFFICE USE ONLY:   Case Number: _____

**AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.**

CCD-JS44

UNITED STATE. ISTRICT COURT, CENTRAL DISTRIC1 CALIFORNIA

**CIVIL COVER SHEET**

**VIII(a).  IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? [X] **No**  [ ] **Yes**

If yes, list case number(s): _____

**VIII(b).  RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? [ ] **No**  [X] **Yes**

If yes, list case number(s): **SACV08-00114 DOC (ANx)**

Civil cases are deemed related if a previously filed case and the present case:

(Check all boxes that apply)     [X] A. Arise from the same or closely related transactions, happenings, or events; or

[ ] B. Call for determination of the same or substantially related or similar questions of law and fact; or

[ ] C. For other reasons would entail substantial duplication of labor if heard by different judges; or

[ ] D. Involve the same patent, trademark or copyright, _and_ one of the factors identified above in a, b or c also is present.

**IX.  VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named plaintiff resides.

[ ]   Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Orange | |

(b) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named defendant resides.

[ ]   Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| | Connecticut, Delaware, Minnesota |

(c) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** claim arose.

**Note: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Orange | |

**\* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties**

Note: In land condemnation cases, use the location of the tract of land involved.

**X.  SIGNATURE OF ATTORNEY (OR PRO PER):**  _David T. DiBiase_   Date  _11-17-08_

David T. DiBiase

**Notice to Counsel/Parties:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |